IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

UNITED STATES OF AMERICA

v. | No. 4:26-CR-314-P

KHALWINDER SINGH BHENGURA

**APPENDIX IN SUPPORT OF UNITED STATES' MOTION IN LIMINE TO PRECLUDE DEFENDANT FROM PRESENTING LEGALLY INVALID DEFENSES**

| Exhibit | Description | App. Pages |
|---|---|---|
| A | Texas Driver License Application of Khalwinder Singh Bhengura, Dated Dec. 12, 2022 | APP001 – APP003 |
| B | Texas Voter Registration Application of Khalwinder Singh Bhengura, Dated Jan. 24, 2024 | APP004 – APP005 |
| C | Texas Driver License Application of Khalwinder Singh Bhengura, Dated Aug. 7, 2024 | APP006 – APP008 |
| D | Report of Homeland Security Investigations Special Agent Van Stephens of Interview of Khalwinder Singh Bhengura on Aug. 26, 2026 | APP009 – APP012 |
| E | Dion Nissenbaum, *Alleged Noncitizen Voters Targeted by Fed from 18 Different Countries, Mostly Green Card Holders*, Salon (Sept. 26, 2026), available at https://www.salon.com/2026/09/26/alleged-noncitizen-voters-targeted-by-feds-from-18-different-countries-mostly-green-card-holders-partner/ | APP013 – APP020 |
| F | Brittany Costello & Josh Beebe, *"He's terrified": Attorney Speaks Out for Green Card Holder Among 7 Charged in North Texas Election Case*, WFAA (Sept. 29, 2026), available at https://www.wfaa.com/article/news/politics/elections/hes-terrified-attorney-speaks-out-for-green-card-holder-among-7-charged-in-north-texas-election-case/287-ce796927-877e-48e5-b5d0-d1e711d7beec | APP021 – APP024 |
| G | Excerpt of Jury Instr., *United States v. Knight*, No. 04-20490 (S.D. Fla. Feb. 14, 2005), Dkt. No. 57 | APP025 – APP028 |
| H | *United States v. Thompson*, 253 F.3d 700, 2001 WL 498430 (5th Cir. 2001) | APP029 – APP043 |

| | | |
|---|---|---|
| I | *United States v. Hungerford*, No. 21-30359, 2023 WL 8179273, at *8 (5th Cir. Nov. 27, 2023) | APP044 – APP052 |
| J | *United States v. Baker*, No. CR 24-99, 2025 WL 1866022, at *4 (E.D. La. July 7, 2025) | APP053 – APP058 |

Dated: October 7, 2026

Respectfully submitted,

RYAN RAYBOULD
UNITED STATES ATTORNEY

*s/ Matthew Capoccia*

Matthew Capoccia
Assistant United States Attorney
Texas State Bar No. 24121526
801 Cherry Street, Suite 1700
Fort Worth, Texas 76102
Telephone: 817-252-5200
Email: matthew.capoccia@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on October 7, 2026, I electronically filed the foregoing document with the clerk for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to the attorney of record who has consented in writing to accept this Notice as service of this document by electronic means. A courtesy copy of the document has also been emailed to the above-mentioned defense counsel.

*s/ Matthew Capoccia*
Matthew Capoccia
Assistant United States Attorney

# Exhibit A

# TEXAS DRIVER LICENSE OR IDENTIFICATION APPLICATION
## (ADULT - 17 YEARS 10 MONTHS OF AGE AND OLDER)

**NOTICE:** All information on this application must be in INK. **Applications held for 90 days only.**
**DPS CANNOT REFUND PAYMENT ONCE APPLICATION IS SUBMITTED.**

FOR DEPARTMENT USE ONLY
RESTRICTIONS/ENDORSEMENTS
ASSIGNED # 48750413

**Application for:** ____ Driver License ✓ Identification Card **Class (select one):** __ A __ B __ C **Motorcycle:** __ Y __ N

**Select one:** ✓ Original ____ Renewal ____ Replacement ____ Address or Name Change

**APPLICANT INFORMATION**

Last Name: BHENGURA First Name: KHALWINDER SINGH Middle Name: /

Suffix: MR. Birth Surname (Maiden): BHENGURA [redacted]

Date of Birth (mm/dd/yyyy): [redacted] Sex (select one): ✓ Male __ Female Height: [redacted] Ft. [redacted] In. Weight: [redacted] lbs.

Eye Color (select one): __ Blue __ Brown __ Gray __ Hazel __ Green ✓ Black __ Maroon __ Pink

Hair Color (select one): ✓ Black __ Red __ Gray __ Brown __ Blonde __ Bald __ White

Race (select one): __ (AI) Alaskan or American Indian ✓ (AP) Asian or Pacific Islander __ (BK) Black __ (W) White

Ethnicity (select one): __ (H) Hispanic Origin ✓ (O) Not of Hispanic Origin __ (U) Unknown

Place of birth: City: [redacted] State [redacted] nty: / Country: INDIA

Father's Last Name: [redacted] Mother's Maiden Name: [redacted]

**CONTACT INFORMATION**

**Residence Address:** [redacted]

City: ARLINGTON State: TEXAS Zip Code: 76010 County: TARRANT

**Mailing Address:** [redacted]

City: ARLINGTON State: TEXAS Zip Code: 76010 County: TARRANT

Home Phone: [redacted] Other Phone: / Email: [redacted]

**In the event of injury or death would you like to provide up to two (2) emergency contacts? If yes, please list:**

a) [redacted] Phone Number [redacted] Address [redacted]

b) Name [redacted] Phone Number [redacted] Address [redacted]

**Alternate Address:** *(Authorized Personnel Only)*

Address: ____

City: / State: / Zip Code: / County: /

**REQUIRED INFORMATION FROM ALL APPLICANTS**

YES NO

1. ✓ ✓ Are you a citizen of the United States? If no, go to question 3.
2. __ ✓ If you are a U.S. citizen, would you like to register to vote? If registered, would you like to update your voter information?
**I understand that giving false information to procure a voter registration is perjury, and a crime under state and federal law. Conviction of this crime may result in imprisonment up to one year in jail, a fine up to $4,000, or both. *PLEASE READ ALL THREE STATEMENTS TO AFFIRM BEFORE SIGNING.***
I am a resident of the county provided above, and a U.S. citizen; I have not been finally convicted of a felony, or if a felon, I have completed all of my punishment including any term of incarceration, parole, supervision, period of probation, or I have been pardoned; And I have not been determined by a final judgment of a court exercising probate jurisdiction to be totally mentally incapacitated or partially mentally incapacitated without the right to vote.
*By providing my electronic signature, I understand the personal information on my application form and my electronic signature will be used for submitting my voter's registration application to the Texas Secretary of State's office. Wanting to register to vote, I authorize the Department of Public Safety to transfer this information to the Texas Secretary of State.*
3. __ ✓ Are you a veteran? If no, go to question 4.
   __ ✓ **a.)** Are you a 60% disabled Veteran receiving compensation and want to waive the application fee? (Proof of disability required)
   __ ✓ **b.)** Do you want a Veteran designator on your DL or ID, or
   __ ✓ **c.)** Are you 50% disabled or are you 40% and have had a lower extremity amputated and want a Disabled Veteran designator on your DL or ID? (Proof of honorable discharge required; some acceptable documents are DD214/215, NGB22, VA disability letter, Veteran Identification card, proof of service/verification of honorable service card. Proof of disability is required for Disabled Veteran designator)
   __ ✓ **d.)** If you want a Veteran or Disabled Veteran designator, do you want the branch of service shown on your DL or ID? If yes, select one:
   / Army __ Air Force __ Coast Guard __ Marines __ Navy
4. __ ✓ Do you have a health condition that may impede communication with a peace officer? (Physician must complete form DL-101).
5. ✓ __ Would you like to register as an organ donor?
6. __ ✓ Do you want to donate $1.00 to the Blindness Education Screening and Treatment Program?
7. __ ✓ Do you want to support the Glenda Dawson Donate Life Texas donor registry? If yes, please indicate a donation amount of $1 or more $ / .00.
8. __ ✓ Do you want to support Texas Veterans? If yes, please indicate a donation amount of $1 or more $ / .00.
9. __ ✓ Do you want to support survivors of sexual assault? If yes, please indicate a donation amount of $1 or more $ / .00 to help fund the testing of sexual assault evidence collection kits (rape kits).
10. __ ✓ Do you want to support the issuance of a DL/ID for foster or homeless youth? If yes, please indicate a donation amount of $1 or more $ / .00 to exempt this population from paying any fees.

DL-14A (Rev. 6/2022)

APPLICATION CONTINUED ON BACK

REQUIRED [illegible] LIC[illegible] ON[illegible] NTIAL [illegible] DEPAR[illegible] ONLY

[redacted]

**REQUIRED INFORMATION FROM FIRST TIME DRIVER LICENSE APPLICANTS ONLY**

**DRIVER HISTORY INFORMATION**

YES NO

1. __ __ Have you ever had a driver license, identification card or instruction permit in Texas or any other state?
   List state(s): ________
   Number(s): ________ When? ________
2. __ __ Are you enrolled in or have you completed an approved driver education course?
3. __ __ Is your driver license or driver privilege **CURRENTLY or EVER** been suspended, revoked, cancelled, denied or disqualified in **ANY** state?
   State? ____ When? ____ Why? ________

**VEHICLE REGISTRATION AND INSURANCE INFORMATION**

1. __ __ Do you own a motor vehicle that is required to be registered? (Texas Transportation Code section 502.040)
2. __ __ Do you own a motor vehicle that is required to have liability insurance OR other proof of financial responsibility in compliance with the Motor Vehicle Safety Responsibility Act? (Texas Transportation Code section 601.051)

NOTICE: The information on this application is required by the Texas Driver License Act, Texas Transportation Code Chapter 521. Failure to provide the information is cause for refusal to issue a driver license or identification card, and in some cases, cancellation or withdrawal of driving privileges. False information could also lead to criminal charges with penalties of a fine up to $4,000.00 and/or jail.

**SOCIAL SECURITY NUMBER COLLECTION DISCLOSURE**

Disclosure of your social security account number is mandatory for identification card and driver license applicants, but voluntary for election identification certificate applicants. This information is solicited pursuant to 42 U.S.C. section 405(c)(2)(C)(i), 42 U.S.C. section 666(a)(13)(A), 6 C.F.R. section 37.11(e), 49 C.F.R. section 383.153, Texas Family Code section 231.302(c)(1), and Texas Transportation Code sections 521.142 and 522.021. The Department will use social security number information for identification purposes and will only release the number as statutorily authorized by Texas Transportation Code section 521.044.

**UNITED STATES SELECTIVE SERVICE**

Any male at least 18 but younger than 26 years of age submitting this application consents to registration with the United States Selective Service System. Alternative options for those who object to conventional military service for religious or other conscientious reasons may be found at: https://www.sss.gov/About/Alternative-Service. By submitting this application, I am consenting to registration with the United States Selective Service System if my registration is required by federal law.

**DO NOT SIGN BELOW UNTIL INSTRUCTED TO DO SO BY NOTARY PUBLIC OR DRIVER LICENSE EMPLOYEE.**

**CERTIFICATION**

I do solemnly swear, affirm, or certify that I am the person named herein and that the statements on this application are true and correct. I further certify my residence address is a *(select one)*: __ single family dwelling, ✓ apartment, __ motel, __ temporary shelter. I agree to immediately report to the Texas Department of Public Safety any changes in my medical condition which may affect my ability to safely operate a motor vehicle. I further understand that I am required by law to report any change of name or address to the Department of Public Safety within thirty days.

X Signature of Applicant [signature] Date 12/7/22

Sworn to and subscribed before me this 07 day of 12, 2022

[signature]
Notary Public in and for the State of Texas/Authorized Officer

DL-14A (Rev. 6/2022)

APP003

# Exhibit B

**Texas Voter Registration Application** VR17.11E3

For Official Use Only

Tarrant

Please mail this application to:

**REGISTRAR OF VOTERS**
**1520 Round Table Drive**
**DALLAS , TX 75247**
**1**

JAN 2 4 2024

REC'D DALLAS CO

FEB 0 2 2024

030302093

17

**Application Type: New**

- Are you a United States Citizen? ............ Yes
- Will you be 18 years of age on or before election day? ............ Yes

**If you checked 'no' in response to either of the above, do not complete this form.**

- Are you interested in serving as an election worker? ............ Yes

Continue below to complete application.

| 2 Last Name: Include Suffix if any (Jr, Sr, III) | First Name | Middle Name (If Any) | Former Name (If Any) |
|---|---|---|---|
| BHENGURA | KHALWINDER SINGH | | |

| 3 Residence Address: Street Address and Apartment Number. If none, describe where you live. (Do not include P.O. Box, Rural Rt. or Business Address) | City | County | State | Zip Code |
|---|---|---|---|---|
| [redacted] | ARLINGTON | DALLAS | TX | 76010-[redacted] |

| 4 Mailing Address: Street Address and Apartment Number (If mail cannot be delivered to your residence address.) | City | State | Zip Code |
|---|---|---|---|
| [redacted] | ARLINGTON | TX | 76010-[redacted] |

5 **City and County of Former Residence in Texas**

| 6 Date of Birth: (mm/dd/yyyy) | 7 Gender (Optional) | 8 Telephone Number, Include Area Code (Optional) |
|---|---|---|
| [redacted]/1956 | Male | (6[redacted] |

| 9 Texas Driver's License No. or Texas Personal I.D. No. (Issued by the Department of Public Safety) | If no Texas Driver's License or Personal Identification, give last 4 digits of your Social Security Number |
|---|---|
| [redacted] | [redacted] |

☐ I have not been issued a TX Driver's License/Personal Identification Number or Social Security Number.

JAN 2 6 2024

10 **I understand that giving false information to procure a voter registration is perjury, and a crime under state and federal law. Conviction of this crime may result in imprisonment up to one year in jail, a fine up to $4,000, or both. Please read all three statements to affirm before signing.**

- I am a resident of this county and a U.S. Citizen;
- I have not been finally convicted of a felony, or if a felon, I have completed all of my punishment including any term of incarceration, parole, supervision, period of probation, or I have been pardoned; and
- I have not been determined by a final judgment of a court exercising probate jurisdiction to be totally mentally incapacitated or partially mentally incapacitated without the right to vote.

X [signature]

01 / 24 / 2024
Date

**Signature of Applicant or Agent and Relationship to Applicant or Printed Name of Applicant if Signed by Witness and Date.**

https://vrapp.sos.state.tx.us/vr17-print.asp 1/1

# Exhibit C

# DL-14A - TEXAS DRIVER LICENSE OR IDENTIFICATION CARD APPLICATION
## (ADULT - 17 YEARS 10 MONTHS OF AGE AND OLDER)

**NOTICE:** All information on this application must be in INK. **Applications held for 90 days only.**
**DPS CANNOT REFUND PAYMENT ONCE APPLICATION IS SUBMITTED.**

FOR DEPARTMENT USE ONLY
RESTRICTIONS/ENDORSEMENTS
ASSIGNED # 50536482

**Application for:** ✓ Driver License ___ Identification Card **Class (select one):** ___ A ___ B ✓ C **Motorcycle:** ___ Y ✓ N

**Select one:** ✓ Original ___ Renewal ___ Replacement ✓ Modify ___ Address or Name Change

### APPLICANT INFORMATION

Last Name: BHENGURA First Name: KHALWINDER SINGH Middle Name: N/A

Suffix: N/A Birth Surname (Maiden): BHENGURA. [redacted]

Date of Birth (mm/dd/yyyy): [redacted] Sex (select one): ✓ Male ___ Female Height: [redacted] Ft. [redacted] In. Weight: [redacted] Lbs.

Eye Color (select one): ___ Blue ___ Brown ___ Gray ___ Hazel ___ Green ✓ Black ___ Maroon ___ Pink

Hair Color (select one): ✓ Black ___ Red ___ Gray ___ Brown ___ Blonde ___ Bald ___ White

Race (select one): ___ (AI) Alaskan or American Indian ✓ (AP) Asian or Pacific Islander ___ (BK) Black ___ (W) White

Ethnicity (select one): ___ (H) Hispanic Origin ✓ (O) Not of Hispanic Origin ___ (U) Unknown

Place of birth: City: [redacted] State: [redacted] County: ___ Country: INDIA

Father's Last Name: [redacted] Mother's Maiden Name: [redacted]

### CONTACT INFORMATION

**Residence Address:** [redacted]

City: ARLINGTON State: TX Zip Code: 76010 County: TARRANT

**Mailing Address:** [redacted] SAME

City: SAME State: ___ Zip Code: ___ County: TARRANT

Primary Phone: N/A Cellular Phone*: [redacted] Email: [redacted]

*Standard data and messaging rates may apply

**In the event of injury or death would you like to provide up to two (2) emergency contacts? If yes, please list:**

a) Name [redacted] Phone Number [redacted] Address [redacted]

b) Name [redacted] Phone Number [redacted] Address [redacted]

**Alternate Address:** *(Authorized Personnel Only)* N/A

City: N/A State: N/A Zip Code: N/A County: N/A

### REQUIRED INFORMATION FROM ALL APPLICANTS

| | YES | NO | |
|---|---|---|---|
| 1. | ✓ | ___ | Are you a citizen of the United States? If no, go to question 3. |
| 2. | ✓ | ___ | If you are a U.S. citizen, would you like to register to vote? If registered, would you like to update your voter information? |

**I understand that giving false information to procure a voter registration is perjury, and a crime under state and federal law. Conviction of this crime may result in imprisonment up to one year in jail, a fine up to $4,000, or both. *PLEASE READ ALL THREE STATEMENTS TO AFFIRM BEFORE SIGNING.***

I am a resident of the county provided above, and a U.S. citizen; I have not been finally convicted of a felony, or if a felon, I have completed all of my punishment including any term of incarceration, parole, supervision, period of probation, or I have been pardoned; And I have not been determined by a final judgment of a court exercising probate jurisdiction to be totally mentally incapacitated or partially mentally incapacitated without the right to vote.

*By providing my electronic signature, I understand the personal information on my application form and my electronic signature will be used for submitting my voter's registration application to the Texas Secretary of State's office. Wanting to register to vote, I authorize the Department of Public Safety to transfer this information to the Texas Secretary of State.*

3. ___ ✓ Are you a veteran? If no, go to question 4.

___ ___ **a.)** Are you a 60% disabled Veteran receiving compensation and want to waive the application fee? (Proof of disability required)

___ ___ **b.)** Do you want a Veteran designator on your DL or ID, or

___ ___ **c.)** Are you 50% disabled or are you 40% and have had a lower extremity amputated and want a Disabled Veteran designator on your DL or ID? (Proof of honorable discharge required; some acceptable documents are DD214/215, NGB22, VA disability letter, Veteran Identification card, proof of service/verification of honorable service card. Proof of disability is required for Disabled Veteran designator)

___ ___ **d.)** If you want a Veteran or Disabled Veteran designator, do you want the branch of service shown on your DL or ID? If yes, select one:
___ Army ___ Air Force ___ Coast Guard ___ Marines ___ Navy

4. ___ ✓ Do you have a health condition that may impede communication with a peace officer? (Physician must complete form DL-101).

5. ___ ✓ Would you like to register as an organ donor? Yes = Add/Keep my name on the Donate Life Texas Registry (Add/Keep Hero's Heart Symbol)
No = Does not add your name to the Registry and does not remove your name if already registered*

*By selecting no, you must remove your name from the Donate Life Texas registry at www.donatelifetexas.org/my-dlt/. Enter your information to gain access to your registration. By doing so, you will have the option to remove your name from the registry.

6. ___ ✓ Do you want to donate $1.00 to the Blindness Education Screening and Treatment Program?

7. ___ ✓ Do you want to support the Glenda Dawson Donate Life Texas donor registry? If yes, please indicate a donation amount of $1 or more $ 0 .00.

8. ___ ✓ Do you want to support Texas Veterans? If yes, please indicate a donation amount of $1 or more $ 0 .00.

9. ___ ✓ Do you want to support survivors of sexual assault? If yes, please indicate a donation amount of $1 or more $ 0 .00 to help fund the testing of sexual assault evidence collection kits (rape kits).

10. ___ ✓ Do you want to support the issuance of a DL/ID for foster or homeless youth? If yes, please indicate a donation amount of $1 or more $ 0 .00 to exempt this population from paying any fees.

DL-14A (Rev. 12/2023)

APPLICATION CONTINUED ON BACK

**REQUIRED INFORMATION FROM DRIVER LICENSE APPLICANTS ONLY (FOR CONFIDENTIAL USE OF THE DEPARTMENT ONLY)**

[redacted]

**REQUIRED INFORMATION FROM FIRST TIME DRIVER LICENSE APPLICANTS ONLY**

**DRIVER HISTORY INFORMATION**

YES NO

1. __ ✓ Have you ever had a driver license, identification card or instruction permit in Texas, any other state or foreign jurisdiction?
   List state(s) or foreign jurisdiction(s): ______
   Number(s): ______ When? ______
2. __ ✓ Are you enrolled in or have you completed an approved driver education course?
3. __ ✓ Is your driver license or driver privilege **CURRENTLY** or **EVER** been suspended, revoked, cancelled, denied or disqualified in **ANY** state?
   State? ______ When? ______ Why? ______

**VEHICLE REGISTRATION AND INSURANCE INFORMATION**

1. __ __ Do you own a motor vehicle that is required to be registered? (Texas Transportation Code section 502.040)
2. __ __ Do you own a motor vehicle that is required to have liability insurance OR other proof of financial responsibility in compliance with the Motor Vehicle Safety Responsibility Act? (Texas Transportation Code section 601.051)

NOTICE: The information on this application is required by the Texas Driver License Act, Texas Transportation Code Chapter 521. Failure to provide the information is cause for refusal to issue a driver license or identification card, and in some cases, cancellation or withdrawal of driving privileges. False information could also lead to criminal charges with penalties of a fine up to $4,000.00 and/or jail.

**SOCIAL SECURITY NUMBER COLLECTION DISCLOSURE**

Disclosure of your social security account number is mandatory for identification card and driver license applicants, but voluntary for election identification certificate applicants. This information is solicited pursuant to 42 U.S.C. section 405(c)(2)(C)(i), 42 U.S.C. section 666(a)(13)(A), 6 C.F.R. section 37.11(e), 49 C.F.R. section 383.153, Texas Family Code section 231.302(c)(1), and Texas Transportation Code sections 521.142 and 522.021. The Department will use social security number information for identification purposes and will only release the number as statutorily authorized by Texas Transportation Code section 521.044.

**UNITED STATES SELECTIVE SERVICE**

Any male at least 18 but younger than 26 years of age submitting this application consents to registration with the United States Selective Service System. Alternative options for those who object to conventional military service for religious or other conscientious reasons may be found at: https://www.sss.gov/About/Alternative-Service. By submitting this application, I am consenting to registration with the United States Selective Service System if my registration is required by federal law.

**DO NOT SIGN BELOW UNTIL INSTRUCTED TO DO SO BY NOTARY PUBLIC OR DRIVER LICENSE EMPLOYEE.**

**CERTIFICATION**

I do solemnly swear, affirm, or certify that I am the person named herein and that the statements on this application are true and correct. I further certify my residence address is a *(select one)*: __ single family dwelling, X apartment, __ motel, __ temporary shelter. I agree to immediately report to the Texas Department of Public Safety any changes in my medical condition which may affect my ability to safely operate a motor vehicle. I further understand that I am required by law to report any change of name or address to the Department of Public Safety within thirty days.

X Signature of Applicant [signature] Date 08/07/2024

Sworn to and subscribed before me this 07th day of August, 2024 #110

[signature]

Notary Public in and for the State of Texas/Authorized Officer

# Exhibit D

# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

## REPORT OF INVESTIGATION

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

08/28/2026 06:59 EDT



**CASE NUMBER**
DA16CS26DA0001

**CASE OPENED**
8/11/2026

**CURRENT CASE TITLE**
Foreign National Voter Fraud Investigation

**REPORT TITLE**
Khalwinder Singh BHENGURA

**REPORTED BY**
Van Stephens
SPECIAL AGENT

**APPROVED BY**
[redacted]
SPECIAL AGENT

**DATE APPROVED**
8/28/2026

## SYNOPSIS

In May 2026, Homeland Security Investigations (HSI) was informed by the Texas State Attorney General's Office (TXAG) that there were numerous individuals identified in voter registration databases that were possibly foreign born subjects who had not become United States Citizens. It appears that several of these subjects participated in various elections in violation of Federal Election Laws. Based upon the information received, HSI Dallas, in coordination with the Federal Bureau of Investigations (FBI) and Citizenship and Immigration Services (CIS) is conducting investigations of these identified subjects to verify citizenship and voter eligibility if it was determined that they registered to vote or voted. Those subjects deemed to have violated election laws will be presented for Federal Criminal Prosecution in the Northern District of Texas. This case is being utilized to document the individuals investigated.

This report documents the investigation of Khalwinder Singh BHENGURA.



This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

## REPORT OF INVESTIGATION

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE



### DETAILS OF INVESTIGATION

Khalwinder Singh BHENGURA is a citizen and national of India who first entered the United States on 08/05/2022 as a Lawfully Admitted Permanent Resident (LAPR) utilizing the "F42" Classification, which is the spouse of a brother or sister of a U.S. Citizen. His visa was based on his wife, [redacted] The entry was made at Chicago O'Hare International Airport. At the time of entry, his period of residency was granted for ten years, and is renewable barring no criminal violations or administrative violations that may prohibit renewal. BHENGURA was issued Alien Registration Number (A#) [redacted]. In July 2024, BHENGURA obtained a replacement I-551 Resident Alien Card due to the original one being lost or stolen. Since his entry in 2022, BHENGURA has not been arrested or convicted of any criminal offenses.

In 2026, HSI Dallas was advised by the State of Texas Attorney General's Office (OAG) Criminal Investigation Division (CID) that BHENGURA had filed a Voter Registration with the state on 01/24/2024 in which he claimed on the form that he was a United States Citizen (USC). Also, the last four digits of the Social Security Number for BHENGURA on the Voter Registration is listed as "[redacted]", which is the same last four digits of the Social Security Number on file for BHENGURA. At that time, BHENGURA was issued Voter Identification Number [redacted]0. Further information provided by the State of Texas indicated that on 11/06/2024, BHENGURA participated in in-person voting in the "2024 November 5th General Election" which occurred on 11/05/2024. This vote took place at the "East Library and Recreation Center" in Tarrant County, Texas.

On 08/26/2026, BHENGURA was located at his residence, [redacted] Arlington, TX 76010. I, Special Agent Van Stephens of Homeland Security Investigations (HSI), along with HSI Special Agent [redacted], conducted a consensual interview with BHENGURA which began at approximately 1750 hours. The interview was conducted in the living room of BHENGURA's apartment. Also present during the interview was his wife, who is previously mentioned in this report. No other people were present in the apartment. BHENGURA was asked to identify himself, which he did, and he also produced his I-551 Lawful Permanent Resident "Green Card" bearing Alien Registration Number (A#) [redacted]. The card also had a picture of his likeness, as well as his full name.

BHENGURA stated his complete name and stated that he was born in Punjab, India on 1[redacted]. BHENGURA was asked when he came to the United States, and he said that he entered in August 2022. When asked what his immigration status was, he replied "green card". BHENGURA was asked if he knew that he was not a U.S. Citizen, and he stated that he did know that he was not a U.S. Citizen. BHENGURA was asked that since he knew he was not a U.S. Citizen, did he know

| Current Case Title | ROI Number | Date Approved |
|---|---|---|
| Foreign National Voter Fraud Investigation | DA16CS26DA0001-003 | 8/28/2026 |



This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE



that he was not allowed to vote. BHENGURA stated "yes sir". BHENGURA was asked if he voted in the general elections on 11/05/2024, and he said "Yes, I did. Mistakenly. Someone told me I could." When asked if he could tell me who that person was, he stated that it was an individual that he only knew as "Brian", but Brian was no longer around. BHENGURA was asked if he was aware that he was not allowed to vote in that election, and he stated "No. My friend (Brian) told me to go there and see if they had my name or not, so I went, and they did. Then I voted". BHENGURA had no other comments that he wished to make regarding our interview, and the interview was concluded at approximately 1755 hours.

Based on the facts discovered in the investigation, it has been determined that Khalwinder Singh BHENGURA is not a United States Citizen. He is a citizen and national of India who is lawfully residing in the United States. BHENGURA registered to vote in the United States and falsely claimed that he is a United States Citizen in order to do so. Based on the facts of the investigation, BHENGURA is being referred to the United States Attorney's Office for the Northern District of Texas (Fort Worth Division) for prosecution of a violation of Title 18 United States Code (USC) § 1015(f)-False Statements of Citizenship in Order to Vote and a violation of Title 18 USC § 611-Voting by Aliens.

This investigation continues.

| Current Case Title | ROI Number | Date Approved |
|---|---|---|
| Foreign National Voter Fraud Investigation | DA16CS26DA0001-003 | 8/28/2026 |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

# Exhibit E

# Alleged noncitizen voters targeted by feds from 18 different countries, mostly green card holders

There's no evidence of any organized efforts to cheat the American electoral system

By **DION NISSENBAUM, VOTEBEAT** PUBLISHED SEPTEMBER 26, 2026 6:00AM (EDT)




A poster showing a sample mail-in ballot is displayed as U.S. Acting Deputy Attorney General Trent McCotter speaks during a press conference at the Department of Justice on September 22, 2026 in Washington, DC. McCotter announced that an election worker in Utah has been indicted for allegedly throwing away ballots. (Photo by Finn Gomez/Getty Images)

Add as a preferred source on Google save

APP014

*This article was originally published by Votebeat, a nonprofit news organization covering local election administration and voting access.*

*Votebeat is a nonprofit news organization reporting on voting access and election administration across the U.S. Sign up for our free weekly newsletter to get the latest.*




For years, Khalwinder Singh Bhengura lived an unassuming life in Arlington, Texas, where the 69-year-old Indian immigrant works a graveyard shift preparing passenger meals for an airline catering company.

Bhengura moved to the U.S. and spent 18 years working toward becoming a legal resident, securing his green card in 2022. It was a cause for celebration in the Bhengura family. Then things took an unexpected turn.

In 2024, according to a federal indictment, Bhengura registered to vote and cast a ballot in the November presidential election, even though he's not allowed to do so without being an American citizen.

Bhengura's case is part of a Trump administration campaign to prioritize prosecuting noncitizen voters.

Related Yes, America, this is really who we are. Vote if you want to change it

On Sept. 10, federal authorities arrested Bhengura and charged him with voting as an alien in a federal election and making a false statement about being a U.S. citizen in order to

register to vote. That makes him one of 70 people the Trump administration has charged in voting fraud cases this year, according to Acting Deputy Attorney General Trent McCotter.

The list includes noncitizens from all corners of the globe, residing in all corners of the U.S. It features everyone from a 20-year-old college student from the Philippines accused of voting in Hawaii to a 39-year-old New Jersey restaurant owner from France. And an examination of the defendants and the filings in their cases found no sign of any organized efforts to cheat the American electoral system.

Votebeat reviewed Justice Department press releases and news accounts since June 1st and identified 41 recent cases involving noncitizens accused of voting. At least 23 defendants are legal residents holding green cards. Those charged range in age from 19 to 73 and come from at least 18 different countries, including Russia, Mexico, Australia, Israel, and Nigeria. Eight of the cases involved undocumented immigrants. About half of the cases come from Texas and New Jersey, with others popping up in a dozen other states, from Alaska to Louisiana.

Lawyers for most of the defendants did not respond to requests for comment. The list contains an eclectic assortment of alleged voter fraud cases. For example, one suspect in Massachusetts is accused of falsely impersonating his landlord to vote as part of a long-running feud between the two Chinese nationals.

The Justice Department has also charged American citizens in connection with the crackdown on fraudulent voting. One Pennsylvania man is accused of voting in both Alaska

and Pennsylvania in the November 2024 presidential election. A city manager in Oklahoma is accused of signing voter registration forms for 11 residents.

But most of the cases involve immigrants like Bhengura who were on the pathway to U.S. citizenship when they voted in elections over the past decade. Bhengura's lawyer says he acknowledged voting, but many of the cases involve nonresidents who secured their green cards, voted in elections, and then denied doing so when they were filling out paperwork or doing interviews to get their American citizenship, according to the legal filings.

***Start your day with essential news from Salon.***
***Sign up for our free morning newsletter, Crash Course.***

Joshua Ferrer, an assistant professor of government at American University, said many legal residents charged with improperly voting don't realize they weren't supposed to do so.

"It's likely most of this is the result of confusion on the part of voters or election officials," Ferrer said.

The fact that there are no indications that these voters were connected as part of any larger scheme "is another sign that the president's claims of widespread voter fraud aren't true," he added.

Bhengura's case raises a number of unanswered questions. Federal prosecutors said Bhengura registered to vote in 2024 when he applied for a driver's license. But Texas law

requires proof of citizenship or lawful presence to get a license, so it's unclear how he could have been registered to vote if he had provided the documentation.

Knox, Bhengura's attorney, defended him as "an honest, hard-working taxpayer and proud U.S. resident. He is terrified to face the government of the same nation that promised liberty and freedom. He prays that justice will prevail."

Carol Lam, who served as U.S. attorney for the Southern District of California under President George W. Bush, questioned the Justice Department's choice to prosecute these people. In her opinion, the government shouldn't try to deport green card holders who didn't know they couldn't vote until they became American citizens.

"Our justice system was not created to terrorize people," she said. "I think voting in national elections when you are not a citizen is a bad thing, but how you deal with these things is the question. If there is good evidence that the person didn't intend to vote, that would be a slap-on-the-wrist kind of situation, and it's instead being used to leverage people to be deported."

Lam acknowledged that every administration has the leeway to decide what crimes to prioritize. But she questioned the Trump administration's decision to devote so much time and energy to cases like Bhengura's.

"Taking a 69-year-old grandfather with a green card with no apparent intent to violate the law who may have voted based on bad information and using it as a jumping-off point to deport a person would be at the bottom of my pile," she said. "We had suspects who

actually committed acts of violence, so there were so many more cases where life and limb were actually at stake."

*Dion Nissenbaum is Votebeat's senior national reporter and is based in Houston. Contact Dion at dnissenbaum@votebeat.org.*

Votebeat is a nonprofit news organization covering local election integrity and voting access. Sign up for their newsletters here.

Read more **about elections**

- **Trump's investigations of the 2020 election may have more to do with 2026**
- **Trump asks GOP crowd to pledge allegiance — to him**
- **"Uncharted territory": Two months from Election Day, Democrats in Texas are truly competitive**

---

By **DION NISSENBAUM, VOTEBEAT**

---

# Exhibit F

ELECTIONS

# 'He's terrified': Attorney speaks out for green card holder among 7 charged in North Texas election case

Lawyer says her client, a 69-year-old immigrant, made an honest mistake; prosecutors call his ballot a deliberate lie.

Author: **Brittany Costello, Josh Beebe**
Published: **7:02 PM CDT September 29, 2026**
Updated: **7:02 PM CDT September 29, 2026**

TARRANT COUNTY, Texas — The attorney for a 69-year-old green card holder charged in a federal election fraud case said her client is terrified and made an honest mistake, while prosecutors say the case reflects a deliberate effort to undermine U.S. elections.

Seven noncitizens have been charged in a coordinated federal and state investigation into illegal voting, the U.S. Attorney's Office for the Northern District of Texas announced. Six of the defendants were indicted Sept. 10, and a seventh was charged by criminal complaint Sept. 11. Six of the cases are out of Tarrant County, and five involve allegations connected to the 2024 election.



"Federal elections belong to American citizens, period," U.S. Attorney Ryan Raybould said at the announcement.

Raybould claimed several of the defendants knowingly and deliberately lied on voter registration forms. He said six of the seven are lawful permanent residents.

"It is a deliberate decision to engage in conduct that targets the foundation of our republic," Raybould said.

He said the prosecutions are a priority for his office and that prosecutors do not consider whom the defendants voted for. "One vote, one instance of voter fraud is a problem because it dilutes the value of every American citizen who casts a ballot," he said.

**Attorney: Client 'worked so long and so hard'**

In her first public comments since the announcement, attorney Nicole Knox said her client, Khalwinder Singh Bhengura, is frightened.

"He's terrified right now," Knox said. "I feel so sorry for him because he is so scared."

Knox said Bhengura, who is from India, spent more than a decade going through the immigration process before receiving his green card in 2022.

According to prosecutors, Bhengura falsely claimed citizenship when registering to vote in January 2024 and again on a Texas driver's license application that August, then voted that November. He was arrested Sept. 11.

Knox said the driver's license application was where the trouble began. She said the Department of Motor Vehicles form was translated only into English, Spanish and Vietnamese, so Bhengura had to ask someone what the other parts meant. When a voter registration card arrived in the mail, she said, he believed it meant he was allowed to vote.

Knox said Bhengura now faces possible deportation.

"He worked so long and so hard to do it the right way," she said.


Close Ad

was ordered deported in July, is accused of voting early in Dallas County; he surrendered to federal agents Sept. 15.

You'll Never Guess Which

Tarrant County District Attorney Phil Sorrells said his office is separately prosecuting two additional local cases. "We're looking, we're watching," he said.

The U.S. Attorney's Office noted the charges are not isolated. It said Eliseo Morales-Tapia, an immigrant living in the country illegally, was sentenced the same day to 36 months in federal prison for aggravated identity theft, identity theft, voting by an alien and false statements of citizenship.

**Expert: Fraud is rare but not impossible**

With the midterm elections weeks away, Southern Methodist University political science professor Matthew Wilson said voters should have confidence in the system while remaining realistic about its limits.

"In a country of 300 million, we can't be perfect," Wilson said.

"People should feel secure both about their own ballots and the security of the overall outcome of our elections, but also we should be honest and acknowledge that fraud and error do exist in a system as big and complex as ours," he said.

Indictments and criminal complaints are allegations, and all defendants are presumed innocent until proven guilty.



# Exhibit G

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 04-20490-CR-COOKE

FILED by MAG. SEC. D.C.
FEB 14 2005

UNITED STATES OF AMERICA

v.

RICARDO KNIGHT
_____________________________/

**COURT'S INSTRUCTIONS TO THE JURY**

Members of the Jury:

It is now my duty to instruct you on the rules of law that you must follow and apply in deciding this case. When I have finished you will go to the jury room and begin your discussions--what we call your deliberations.

It will be your duty to decide whether the Government has proved beyond a reasonable doubt the specific facts necessary to find the Defendant guilty of the crimes charged in the indictment.

57/1K

JURY INSTRUCTION NO. 8

Title 18, United States Code, Section 611 makes it a Federal crime or offense for an alien to vote in an election held solely or in part to elect a candidate for federal office.

The Defendant can be found guilty of that offense only if all of the following facts are proved beyond a reasonable doubt:

First: That the Defendant knew he was an alien at the time alleged in the indictment;

Second: That the defendant knowingly voted in an election; and

Third: That one purpose of the election in question was to elect a candidate for the office of either President, Vice President, Presidential elector, Member of the Senate, Member of the House of Representatives, Delegate from the District of Columbia, or Resident Commissioner.

In order to prove a violation of Section 611, it is not necessary for the government to prove that the Defendant knew it was unlawful for an alien to vote.

An "alien" is a person who is not a citizen of the United States.

American citizenship is acquired by birth within the United States, or through judicial proceedings known as "naturalization". One is also a citizen, even

though born outside the United States, if both parents were citizens and one of them had a residence in the United States prior to the birth.

The term "election" includes initiatives, recalls, and referendums.

# Exhibit H

253 F.3d 700
This case was not selected for publication in the Federal Reporter.
Not for Publication in West's Federal Reporter See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007. See also Fifth Circuit Rules 28.7, 47.5.3, 47.5.4. (Find CTA5 Rule 28 and Find CTA5 Rule 47)
United States Court of Appeals,
Fifth Circuit.

UNITED STATES of America, Plaintiff-Appellee,
v.
Ralph Nathaniel THOMPSON; Timothy Gardell Wooten; Gerald Phillip Wooten, Defendants-Appellants.

No. 99-41007.
|
April 9, 2001.

Appeals from the United States District Court for the Eastern District of Texas (4:98-CR-64).

Before GOODWIN,[*] GARWOOD and JONES, Circuit Judges.

**Opinion**

GARWOOD, Circuit Judge dissenting in part.

EDITH H. JONES, Circuit Judge.[**]

***1** Defendant-Appellants Ralph Thompson, Timothy Wooten and Gerald Wooten were convicted on a variety of conspiracy and substantive offenses arising out of a multi-state cocaine distribution and money laundering enterprise that engaged in acts of violence, including murder, robbery, and obstruction of justice. Appellants now assert multiple errors regarding sufficiency of the evidence, the verdict form, the jury charge, denials of motions for severance, the indictment, the constitutionality of 18 U.S.C. 922(g), a motion in limine regarding the closing argument, and sentencing.

After carefully reviewing the arguments and the record, the court finds that there is no merit to the appellants' complaints. We affirm.

BACKGROUND

On August 12, 1998, the grand jury for the Eastern District of Texas named, among others, all three Defendant-Appellants in an eighteen count indictment. On October 15, 1998, Ralph Thompson and Gerald Wooten filed motions to sever. The district court denied severance on April 8, 1999. A second superseding 18 count indictment[1] was returned on March 11, 1999, again naming all three Defendant-Appellants. All three Appellants were tried by jury in a single proceeding in the Eastern District of Texas, Sherman Division. On May 21, 1999, all were convicted of various offenses related to their participation in the cocaine distribution and money laundering enterprise. Ralph Thompson was sentenced to life in prison. Timothy Wooten was sentenced to life in prison plus thirty-five years. Gerald Wooten was sentenced to 360 months on count three and 240 months on count seventeen, to be served concurrently. All three now appeal to this court, assigning various errors and claiming insufficiency of the evidence.

The Government alleged that the appellants were, to varying degrees, involved in "a multi-state cocaine distribution and money laundering enterprise .... " The enterprise shipped cocaine from California to Texas, Colorado, Kansas and Alabama using commercial carriers and drug couriers. The proceeds of the sales were funneled back to California using the mails, couriers and Western Union. The enterprise used violence to maintain discipline and silence.

Mark Barney was the leader of the enterprise. Both his brother, Vincent Barney, and girlfriend, Kelley Sorbellini, were involved. All three were named in at least one count of the second superseding indictment. All made deals with the Government and testified at trial.

Ralph Thompson started out as a drug courier but his role eventually expanded. He became Mark Barney's right-hand man and served as liaison between Barney and other major distributors. Thompson, who had an ability to transport cocaine without arousing suspicion, made many flights transporting drugs. He also participated in the channeling of proceeds back to California. He was present when the Timothy Wooten Texas robbery and murder scheme was first

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

discussed. Thompson was convicted on counts one, two, three and seventeen.

***2** Timothy Wooten distributed large amounts of the enterprise's cocaine in Texas and participated in the money laundering operation that returned the proceeds to California. He was also involved in acts of violence. In November 1994, Tim Wooten discussed with Mike Whittaker, another enterprise dealer, a proposal to lure four of Whittaker's customers from Oklahoma to Paris, Texas, to purchase cocaine. The idea was for the four to be robbed and murdered so that Tim Wooten could repay a drug debt he owed to Mark Barney. The plan called for two of the Oklahomans to be shot in a hotel room while the other two would be shot at the rural site of the supposed drug deal. A silencer would be used for the hotel room murders. The two Oklahomans at the rural site were murdered by Wilbert Watson. The other two escaped death. In February 1995, Mark Barney, in Ralph Thompson's presence, stated that something had to be done with Frankie Dunham, an employee of the enterprise who was cooperating with police. More meetings between Mark Barney and Tim Wooten followed. Tim Wooten murdered Dunham in May 1995, one week before she was to testify against Mark Barney in a state court proceeding. The jury found Tim Wooten guilty of counts one through seventeen.

Gerald Wooten, Tim Wooten's brother, was not charged under RICO, but was involved in a few incidents of delivering packages of cocaine and wiring of drug money back to California. The jury found Gerald Wooten guilty on counts three and seventeen.

DISCUSSION

A. Motions for Severance

Both Thompson and Gerald Wooten contend that the district court erred by failing to grant their motions for severance, thereby denying their rights to due process as guaranteed by the Sixth Amendment. Thompson argues that he was prejudiced because a significant part of the trial testimony dealt with the murders and attempted murders of the four Oklahomans. Thompson contends that he had no involvement, in these murders or the events surrounding them, beyond the inference that he delivered drugs to the leader of the conspiracy Mark Barney. In addition, he complains that he was prejudiced by "graphic depictions and courtroom theatrics," including testimony from dentists identifying decomposed bodies and violent and gory photographs. The testimony was presented, Thompson argues, in such a manner as to shock the conscience. For example, while one witness testified about finding the bodies of murder victims, members of the victims' families were comforted and assisted out of the courtroom by Assistant United States Attorneys. For these reasons, Thompson requests that his conviction be vacated and that the matter be remanded for a new trial.

Gerald Wooten likewise argues that he was prejudiced to such an extent that he received an unfair trial. Similar to Thompson, he complains about the amount and nature of the evidence admitted as proof of the Paris, Texas murders. He also points to the fact that the Government attempted to link him to the murders and acts of violence by referencing telephone calls made to him on the night of the murders. These calls, he argues, left the jury with the impression that he had some role, albeit minor, in those murders. He also argues that his brother's fugitive status was prejudicial. Further, he submits that the judge did not provide adequate protection through the jury instructions because he did not clarify the fact that Gerald Wooten was not charged in the RICO count and must be distinguished from his co-defendants. For example, he complains that at one point the court incorrectly advised that the indictment contained seventeen counts and that Ralph Nathaniel Thompson and Timothy *Gerald* Wooten, as opposed to Timothy Gardell Wooten, only are charged in count one. Finally, he argues that the court failed adequately to distinguish and separate the counts charged against him.

***3** Federal Rule of Criminal Procedure 14 provides that a district court may order severance of defendants if it appears that a defendant is prejudiced by joinder. Fed. R.Crim. Pro. Rule 14. A district court's decision to deny a Rule 14 motion to sever is reviewed for abuse of discretion. *United States v. Pasado-Rios,* 158 F.3d 832, 863 (5th Cir.1998). The general rule is that " 'persons indicted together should be tried together, especially in conspiracy cases, and ... the mere presence of a spillover effect does not ordinarily warrant severance ....' " *Id.* (quoting *United States v. Moser,* 123 F.3d 813, 828 (5th Cir.1997) (quoting *United States v. Pofahl,* 990 F.2d 1456, 1483 (5th Cir.1993))). A defendant's burden is two-fold. He must show first that " 'the joint trial prejudiced him to such an extent that the district court could not provide adequate protection.' " *United States v. Richards,* 204 F.3d 177, 193 (5th Cir.2000) (quoting *United States v. McCord,* 33 F.3d 1434, 1452 (5th Cir.1994) (quoting *United States v. DeVarona,* 872 F.2d 114, 120-21 (5th Cir.1989))). He must present " 'clear, specific and compelling prejudice that


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

resulted in an unfair trial" *Posada-Rios,* 158 F.3d at 863 (quoting *United States v. Bullock,* 71 F.3d 171, 174 (5th Cir.1995)), and "that he did not receive adequate protection from the potential prejudice of a joint trial through the court's instructions to the jury." *Posada-Rios,* 158 F.3d at 863. Second, he must show that "the prejudice outweighed the Government's interest in economy of judicial administration." *Richards,* 204 F.3d at 193.

The district court took various steps to lessen the prejudice to each defendant. During voir dire, the district court instructed the jury to consider separately the charges against each defendant. In his preliminary instructions to the jury, the court admonished them to give separate consideration to the case against each defendant. The jury charge likewise instructed:

> A separate crime is charged against one or more of the defendants in each count of the Superseding Indictment. Each count, and the evidence pertaining to it, should be considered separately. Also, the case of each defendant should be considered separately and individually. The fact that you may find one of the accused guilty or not guilty of any of the crimes charged should not control your verdict as to any other crime or other defendant. You must give separate consideration of the evidence as to each defendant.

This court has held virtually identical instructions sufficient, among other factors, to cure the possibility of prejudice. *Pasado-Rios,* 158 F.3d at 863-64; *see also* *Richards,* 204 F.3d at 194. Indeed, the Supreme Court has stated that "less drastic measures [than severance], such as limiting instructions, often will suffice to cure any risk of prejudice." *Zafiro v. United States,* 506 U.S. 534, 539, 113 S.Ct. 933, 938 (1993).

***4** Here, the court took another step by allowing the jurors to take notes during the trial. *Posada-Rios,* 158 F.3d at 863. The jurors were also provided a copy of the indictment and written charge of the court during deliberations. In addition, attempting to prevent the possibility of prejudice, the court gave a specific instruction to the jury, after the family members were led out, not to "draw any kind of inference at all from anyone being asked to leave the courtroom or leaving the courtroom. Just put it out of your mind. Ignore it. Don't draw any inference at all from it."

Moreover, we have previously rejected the argument that evidence of crimes committed by co-conspirators, including gruesome murders, suffices to establish prejudice. *Posada-Rios,* 158 F.3d at 863. We have held that "the pernicious effect [of spillover] ... is best avoided by precise instructions to the jury on the admissibility and proper uses of the evidence introduced by the Government." *United States v. Harrelson,* 754 F.2d 1153, 1175 (5th Cir.1985). Likewise, that there was a "large volume of evidence introduced" concerning the murders is not dispositive because "a quantitative disparity in the evidence 'is clearly insufficient in itself to justify severance.' " *U.S. v. Pettigrew,* 77 F.3d 1500, 1517 (5th Cir.1996) (quoting *United States v. Neal,* 27 F.3d 1035 (5th Cir.1994)).

In addition, the Government correctly points out that Thompson was indicted for being part of an enterprise that enriched and protected its members, in part by committing and threatening "acts of violence including murder, attempted murder and robbery," and by promoting or engaging in activities "designed to prevent members and associates of the enterprise from disclosing the activities of the enterprise to law enforcement authorities." *See* Count 1, paras. 2a-3d. Although Thompson apparently did not know beforehand of the conspiracy to rob and kill the Oklahomans, Thompson continued his association with the enterprise and its members after learning of the murders.[2] He was an employee or associate of an enterprise with violent aspects, means and members. The Government contends that the prosecution could not have presented its case against any employee or associate of the "enterprise" without presenting all of the evidence to give an accurate depiction of the enterprise.

Testimony from Vincent Barney supports the Government's contention that Thompson had knowledge and was concerned about the investigation of Frankie Dunham's murder. Vincent Barney testified that his brother, Mark Barney, who later pled guilty to soliciting Dunham's murder, and Thompson, questioned him after the murder about whether or not homicide investigators had asked him questions about the murder. The two informed Vincent Barney that law enforcement had "nothing on us" and "were grabbing at straws." Vincent also testified that he knew that Mark Barney knew about and was upset that Frankie Dunham was a witness against him. Mark Barney testified that it was "important to all of us," including Thompson, that Frankie Dunham not testify again him. This was the case because if Barney "went down," Thompson, Tim Wooten and others, would not have access to Barney's suppliers. In sum, based on the judge's instructions and the evidence linking Thompson to the Dunham murder, the district court did not abuse its discretion by denying Thompson's motion to sever.

***5** Likewise, the court did not err with respect to Gerald Wooten. In addition to the aforementioned instructions, the

judge specifically instructed the jury that testimony from a witness about Frankie Dunham was "not to be considered at all for any purpose in connection with" Gerald Wooten.

We do not agree with Gerald Wooten's assertion that the district court's mispronunciation of his brother's name was prejudicial. The district court made this mistake during the preliminary instructions to the entire group of prospective jurors. During those same instructions, the judge correctly pronounced Tim Wooten's name many times. At the same time, the court asked the following of the venire members:

> They are all seated over there together, but I want to find out if you can give each one of the defendants the benefit of considering his case separately and considering the evidence against the defendant separately and not be influenced by the fact that he's seated at a counsel table with other defendants that are also charged, some charged in counts in which the defendant is not charged. Can you separate in your mind those three defendants and the evidence that is submitted against them?

The judge dismissed the two venire members who indicated that they would have difficulty making such a distinction.

Gerald's most sympathetic argument is that because of the prejudicial joinder, the Government implied that he played some part in the Oklahoman's murders. The only evidence of a connection came from records of telephone calls exchanged between the location of the murders, just after they were committed, and Gerald's workplace. Weak as the inference from these records might be, it seems the same evidence could have been offered for proof of his part in the conspiracy in a separate trial of Gerald. Regardless of that circumstance, this court has previously held that neither a disparity in the amount of evidence against each defendant, nor the fact that a defendant was only a minimal participant, constitutes prejudice. *United States v. Fields,* 72 F.3d 1200, 1215 (5th Cir.1996); *United States v. Krout* 66 F.3d 1420, 1430 (5th Cir.1995) (citing *United States v. Neal,* 27 F.3d at 1045). The court did not abuse its discretion in denying severance.

B. Sufficiency of the Evidence on the RICO convictions of Thompson and Tim Wooten

Thompson and Tim Wooten submit that the evidence was insufficient to convict them on both the substantive and conspiracy RICO charges. When reviewing a sufficiency of the evidence challenge, this court does not "weigh the evidence or ... determine the credibility of the witnesses. The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469 (1962). The evidence need not exclude every reasonable hypothesis of innocence. *United States v. Leed,* 981 F.2d 202, 205 (5th Cir.1993). If a rational trier of fact could have found each essential element of the offense established beyond a reasonable doubt, the verdict must be affirmed. *Posada-Rios,* 158 F.3d at 855.

***6** The RICO statute charged in the indictment, 18 U.S.C. § 1962(c), prohibits "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." When establishing such a violation, the Government must prove "(1) the existence of an enterprise that affects interstate or foreign commerce, (2) that the defendant was 'employed by' or 'associated with' the enterprise, (3) that the defendant participated in the conduct of the enterprise's affairs, and (4) that the participation was through a 'pattern of racketeering activity.' " *Posada-Rios,* 158 F.3d at 855 (citing *United States v. Erwin,* 793 F.2d 656, 670 (5th Cir.1986)). We review each of the elements.

1. Enterprise

18 U.S.C. § 1961(4) states that an "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." This court has defined "enterprise" as "an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Williams,* 809 F.2d 1072, 1094 (5th Cir.1987). It may be "proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Id.* (quoting *United States v. Turkette,* 452 U.S. 953, 99 S.Ct. 349 (1978)). The enterprise "must have an existence separate and apart from the pattern of racketeering." *Crowe v. Henry,* 43 F.3d 198, 205 (5th Cir.1995). The "continuing unit" may be " 'shown by a hierarchical or consensual decision making structure.' " *Id.* at 205 (quoting *Delta Truck & Tractor, Inc., v. J.I. Case Co.,* 855 F.2d 241, 243 (1988)). In determining that an enterprise exists, we may also look to the "number of acts, their relationship, their having taken place over several years, and the consistent participation of the central figures in the scheme." *United States v. Doherty,* 867 F.2d 47, 68 (1st Cir.1989). A jury may "infer the existence of an enterprise on the basis of largely or

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

wholly circumstantial evidence." *United States v. Elliot,* 571 F.2d 880, 898 (5th Cir.1978).

Thompson argues that there was insufficient proof of an enterprise. He does not dispute that the Government's evidence supports a finding that a common or shared purpose existed. Rather, he argues that the Government lacked proof that the alleged structure had any continuity of structure and personality. *See United States v. Bledsoe,* 674 F.2d 647, 665 (8th Cir.1982).[3] He argues that, contrary to the Government's contention, the alleged substitution of him into the place of Vincent Barney does not support this element because, according to the Government's evidence, he and Vincent Barney merely packaged the cocaine. In addition, he argues that the fact that the "enterprise activity" ceased after the arrest of Mark Barney provides strong evidence that the "enterprise" lacked continuity.

***7** We decline to adopt the *Bledsoe* definition of enterprise. The record reveals sufficient evidence of a continuing unit with a consensual decisionmaking structure, as required by this circuit. As the Government argues, the evidence shows that the enterprise consisted of its leader, Mark Barney, and his "team", including Ralph Thompson, Vincent Barney, Tim Wooten, Wilbert Watson, Mike Whittaker, and Kerwin "Buddy" Wade. Mark Barney brought members of the team together and organized connections among them. Their common goal was to enrich the members of the association by sharing the economic benefits of the enterprise and by preserving the organization.[4] This group, tracing through Mark Barney, formed lines of interdependence. For example, Mark Barney provided evidence of this interdependence when he testified that it was "important to all of us" that Frankie Dunham not testify against him, because it "would shut business down" and that those in Kansas, Texas and Colorado would "get cut off," including Tim Wooten and Ralph Thompson.

Mark Barney designated certain assignments for the team members. Vincent Barney scanned kilos of powdered cocaine that he got from "Chicalee," a supplier, cleaning them of metal fragments and re-packaging them. Thompson carried the kilos on commercial airlines and interacted with the public and other members of the organization. Thompson delivered drugs to Tim Wooten and Buddy Wade, and others, who in turn moved large quantities of cocaine through networks of cocaine dealers. They also kept a steady flow of money into the office of the organization. When in trouble, members of the team worked to bail each other out. Members also met on different occasions to discuss the organization and various problems.

2. "Employed By" or "Association With" the Enterprise

The evidence shows that Thompson and Tim Wooten were "employed by" or "associated with" the enterprise. Thompson served as the liaison between Mark Barney and associates in Texas to whom he delivered kilos of cocaine for sale and distribution. He was the only other person who knew the name of Mark Barney's source. He understood the inner workings of the enterprise and interacted with many associates. He was the mediator between the field and the home office when Barney was absent. Other employees or associates prepared packages of cocaine for him to pick up. Frankie Dunham made airplane and hotel reservations for him. Transportation, such as limousine rentals, was often arranged for him. He traveled frequently for the enterprise. While he began as an employee, he later became an investor or partner, sharing both the costs and profits of the enterprise.

According to testimony from Vincent Barney, Tim Wooten served as the key distributor of cocaine in the Dallas, Texas area, and as the conduit of cocaine between Mark Barney and others. He supplied both his brother, Gerald Wooten, and Wilbert Watson. In addition, he brought Mike Whittaker into the enterprise. At one point, Whittaker and Wooten flew to California to meet with Mark Barney and to receive cocaine. Tim Wooten delegated to Whittaker the responsibility of supplying cocaine to Gerald Wooten and Wilbert Watson.

3. Participation in the Conduct of the Enterprise's Affairs

***8** Both Thompson and Tim Wooten argue that the Government did not establish that they participated in the conduct of the enterprise's affairs as required by *Reves v. Ernst & Young,* 507 U.S. 170, 113 S.Ct. 1163 (1993). In particular, they argue the Government did not meet the "operation and management" test set forth in *Reves* because neither took part in directing the affairs of the enterprise. Thompson contends that he was a "mere 'mule' ", and Wooten submits that he was a "mere 'party' " or a "user."

Contrary to the appellants' contention, *Reves* does not require that a defendant direct the affairs of the enterprise. *Posada-Rios,* 158 F.3d at 856 ("Although such evidence [of decision-making power] would certainly be relevant to show that a defendant participated in the operation of an enterprise, *Reves* does not require it."). In *Reves,* the Supreme Court held that a conviction under § 1962(c) required that "one must

participate in the operation or management of the enterprise itself." *Reves,* 507 U.S. at 185, 113 S.Ct. at 1173. The term "participate" was meant to have the "common understanding of the word ... to take part in." *Id.* at 179, 113 S.Ct. at 1170. This court noted in *Posada-Rios* that the Supreme Court "specifically rejected the D .C. Circuit's suggestion that § 1962(c) requires significant control over or within an enterprise." *Posada-Rios,* 158 F.3d at 856 (citing *Reves,* 507 U.S. at 179 n. 4, 113 S.Ct. at 1170 n. 4). Rather, "[t]he [*Reves* ] Court held that 'the word 'participate' makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs." *Id.* (quoting *Reves,* 507 U.S. at 179, 113 S.Ct. at 1170). In particular, the *Reves* Court explained that an enterprise may be 'operated' both by upper management and by lower rung participants. *Id.* (quoting *Reves,* 507 U.S. at 184, 113 S.Ct. at 1173). For example, in *Posada-Rios,* this court found that a mid-level distributor participated in the operation "by deciding how much cocaine to buy and what prices and terms to charge to the lower-level distributors to whom he redistributed the cocaine." *Id.* As has been described at length above, the evidence is sufficient to show that Tim Wooten and Thompson were operational participants as required by *Reves,* and that Thompson participated in the management.

4. Pattern of Racketeering Activity

Tim Wooten argues that the Government failed to establish that there was a pattern of racketeering activity. In particular, he submits that the Government did not prove that there was a continuing threat of criminal activity. He points to the fact that the last relevant act alleged in the indictment occurred more than two years before the date of the second superseding indictment. He also states that the Government did not allege any criminal violation between August 1995 and the time that Wooten and his co-defendants were incarcerated in 1998. Finally, he states that following Mark Barney's conviction and incarceration, the enterprise ceased without law enforcement intervention.

***9** 18 U.S.C. § 1651(5) states that establishing a "pattern of racketeering activity" requires that at least two racketeering predicates were committed within a 10-year period. The Supreme Court, in *H.J., Inc. v. Northwestern Bell Telephone Co.,* held that this element requires that a plaintiff or prosecutor show both "that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." 492 U.S. 229, 239, 109 S.Ct. 2893, 2900 (1989). Wooten challenges only the continuity element of the "pattern of racketeering" requirement.

The continuity requirement stems from Congress's concern "in RICO with long-term criminal conduct." *Id.* at 242, 109 S.Ct. at 2902. *H.J., Inc.* stated that 'continuity' may refer to either a closed-ended or an open-ended period. *Id.* at 241, 109 S.Ct. at 2901. This case may be evaluated under the closed-ended concept because it involves a closed period of repeated conduct. By contrast, an open-ended period would involve "past conduct that by its nature projects into the future with a threat of repetition." *Id.*[5] Both are temporal concepts.

Sufficient proof of continuity over a closed period may be demonstrated "by providing a series of related predicates extending over a substantial period of time." *Id.* at 242, 109 S.Ct. at 2902. *H.J., Inc.* gave little direction as to what may constitute a "substantial period of time" other than stating that "[p]redicate acts extending over a few weeks or months and threatening no criminal conduct do not satisfy this requirement." *Id.* This court has held that seven months is an insufficient period of time, *see Tel-phonic Services, Inc. v. TBS Int'l, Inc.,* 975 F.2d 1134, 1140 (5th Cir.1992), but that two racketeering acts extending nearly four years suffices, *see United States v. Bustamante,* 45 F.3d 933, 941-42 (5th Cir.1995).

Wooten does not contest the time period between the first and last predicate acts. The evidence showed that the enterprise spanned 20-21 months, beginning in December 1993 and ending in August 1995. Following our sister circuits, we hold that 20-21 months is a sufficient time period to establish continuity. *See Allwaste, Inc. v. Hecht,* 65 F.3d 1523, 1528 (9th Cir.1995) (thirteen months could demonstrate a "substantial period of time" to satisfy the continuity requirement); *United States v. Pelullo,* 964 F.2d 193, 209 (3rd Cir.1992) (a jury could find a period of nineteen months sufficient for a finding of continuity); *United States. v. Freeman,* 6 F.3d 586, 596 (9th Cir.1993) (two years); *Resolution Trust Corp. v. Stone,* 998 F.2d 1534, 1543 (10th Cir.1993) (eighteen months); *Metromedia Co. v. Fugazy,* 983 F.2d 350, 369 (2nd Cir.1992) (two years); *United States v. Stodola,* 953 F.2d 266, 270 (7th Cir.1992) (twenty months). Contrary to Wooten's contention, therefore, the continuity requirement did not necessitate that the Government allege a continuation of unlawful acts during the period from August 1995 until his incarceration in 1998.

5. Count 2-RICO Conspiracy


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

***10** Both Thompson and Tim Wooten challenge the sufficiency of evidence as to Count 2, the RICO conspiracy charge. Neither, however, explains in what respect the evidence is insufficient or develops his insufficiency argument. The briefs contain no argument or discussion of the facts as related to the RICO conspiracy charge. They have not complied with the requirements of Fed. R.App. P. 28(a)(9) and have waived this issue. *See Posada-Rios,* 158 F.3d at 867.

C. Jury Verdict Form

Thompson and Tim Wooten argue that the failure to require the jury to designate in its verdict form which specific acts were unanimously agreed upon to support the "pattern of racketeering activity" element, denied them due process. Both concede that the jury was properly instructed, but they assert that because the verdict form required only a general finding of guilt as to Count one of the indictment, they are unable to determine and test on which specific acts the jury relied to support the guilty verdicts. Neither objected to the verdict form at trial.

Since the defendants did not object to the verdict form during trial, we review these claims for plain error. *See United States v. Jones,* 132 F.3d 232, 245 (5th Cir.1998). A district court has the discretion to decide whether to submit special interrogatories as to each element of an offense to the jury. *United States v. Console,* 13 F.3d 641, 663 (3d Cir.1993). *See also Griffin v. United States,* 502 U.S. 46, 47, 112 S.Ct. 466, 473 (1991). There is no right to a verdict on each element of an offense. *Id.* Confusion created by a verdict form may be cured by a jury instruction. *Jones,* 132 F.3d at 245. *See also United States v.. Flores,* 63 F.3d 1342, 1374 (5th Cir.1995). Where a district court properly instructs the jury on the elements of a RICO conspiracy violation and, in particular, the requirement of unanimity regarding the predicate offenses, we do not find plain error. *See United States v. Shenberg,* 89 F.3d 1461, 1472 (11th Cir.1996) (holding that a district court did not abuse its discretion when it gave a proper unanimity instruction but denied a request for a special verdict form).

The district court judge instructed the jury that:

> At a minimum, a pattern of racketeering activity requires at least two acts of racketeering activity within ten years of each; provided, however, that the government proves the relationship and continuity of those acts as I have defined them for you. All of you must be unanimous as to which racketeering acts you each believe beyond a reasonable doubt that the defendant under consideration committed. *Unless you are unanimous in finding beyond a reasonable doubt that the defendant under consideration committed a racketeering act charged, you must disregard that act in deciding whether that defendant is guilty or not guilty of racketeering.* It is not sufficient that some of the jurors find that the defendant committed two of the acts while others of you find that the defendant committed different acts. (emphasis added).

***11** "We presume that a jury follows the court's instructions." *Id.* (citing *United States v. Stone,* 9 F.3d 934, 938 (11th Cir.1993)). The appellants provide no reason to doubt that this jury properly followed the court's instructions. The district court did not plainly err by submitting a general verdict form.[6]

D. Money Laundering Conspiracy

Both Gerald Wooten and Ralph Thompson challenge the sufficiency of the evidence to convict them for conspiracy to commit money laundering transactions in violation of 18 U.S.C. § 1965(h), as alleged in Count 17. A conviction for conspiracy to launder money requires that the Government prove five elements:

> (1) there is a conspiratorial agreement, (2) one conspirator knowingly commits an overt act by participating in a financial transaction, (3) the financial transaction involves the proceeds of an unlawful activity, (4) the conspirator participating in the transaction had the intent to promote or further that unlawful activity, and (5) the transaction affected interstate or foreign commerce.

*United States v. Fierro,* 38 F.3d 761, 768 (5th Cir.1994).

Thompson argues on appeal that the Government did not present sufficient evidence to establish his overt acts. Count 17 of the indictment lists fifty-one overt acts of money laundering. Thompson is the designated sender of a money transfer through Western Union in Act 2 and the designated recipient of money transfers through Western Union in Acts 47 and 48. Thompson's only contention is that the Government did not present sufficient evidence to prove that the Act 2 sender and Acts 47 and 48 recipient were, in fact, Thompson. We disagree.

Regarding Act 2, Ralph Thompson's name appears as the sender and Vincent Barney as the recipient in Western Union documents. Vincent Barney verified that Thompson sent and that Barney received the money transfer, which was for drug proceeds. As to Acts 47 and 48, a Western Union representative testified that Ralph Thompson's name


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:26-cr-00314-P Document 29 Filed 10/07/26 Page 40 of 61 PageID 203

appeared as the recipient of the money transfer and that proof of recipients' identification is always checked for money transfers over $500. Act 47 involved a transfer of $2,000 from Tim Wooten to Thompson; Act 48 involved a transfer of $1,330 from Tim Wooten to Thompson.

Gerald Wooten also contends that the Government failed to prove by a reasonable doubt that he knew the proceeds involved an illegal activity or that he intended to promote or further an illegal activity. We find that a juror could make such inferences. Western Union records list Gerald as the sender in Acts 22 and 37. Wooten admitted to sending the two Western Union wire transfers to Vincent Barney and told a Special Agent that "he felt that what he was doing was a relatively minor thing and there was little chance he would get caught." This statement supports the inference that Gerald knew that the money was for the proceeds of illegal activity. While Gerald's involvement may have been minor, only one overt act is required to prove that a defendant was involved in a money laundering conspiracy.

E. Conspiracy to Possess With Intent to Deliver a Controlled Substance

1. Ralph Thompson and Tim Wooten

***12** All three Appellants argue that the evidence was insufficient to support their convictions for violation of 21 U.S.C. § 846, conspiracy to possess with intent to deliver a controlled substance. Thompson contends that the Government's evidence consisted of circumstantial evidence "woven together" by the "purchased testimony from the likes of Mark Barney, Vincent Barney and Kelly Sorbellini." He argues that the volumes of telephone records, flight records and hotel records do not positively identify him. In addition, he asserts that the Government never presented any contraband obtained from Thompson, or photographic, audio or video evidence supporting the Government's claims. Tim Wooten likewise argues that there was no evidence that he intended to join or associate himself with the objective of the conspiracy and complains that all of the evidence against him comes from "paid informants."

"To establish guilt of a drug conspiracy under 21 U.S.C. § 846, the Government must prove that (1) there was an agreement between two or more persons to import or possess controlled substances with intent to distribute; (2) each defendant knew of the conspiracy and intended to join it; and (3) each defendant voluntarily participated in the conspiracy." *United States v. Mitchell,* 31 F.3d 271, 274 (5th Cir.1994). All elements must be proven, but all may be inferred from circumstantial evidence. *United States v. Espinoza-Seanez,* 862 F.2d 526, 537 (5th Cir.1989). "Circumstances altogether inconclusive, if separately considered, may, by their number and joint operation ... be sufficient to constitute conclusive proof." *Mitchell,* 31 F.3d at 274 (quoting *United States v. Lechuga,* 888 F.2d 1472, 1476 (5th Cir.1989)). As such, "an agreement may be inferred from a 'concert of action.' " *Espinoza-Seanez,* 862 F.2d at 536 (quoting *United States v. Vergara,* 687 F.2d 57, 61 (5th Cir.1982)). "Knowledge may be inferred from 'surrounding circumstances.' " *Id.* (quoting *Vergara,* 687 F.2d at 61). "Voluntary participation may be inferred from 'a collocation of circumstances.' " *Id.* (quoting *United States v. Marx,* 635 F.2d 436, 439 (5th Cir.1981)). Most importantly, for our purposes, " '[a]s long as it is not factually insubstantial or incredible, the uncorroborated testimony of a co-conspirator, even one who has chosen to cooperate with the Government in exchange for non-prosecution or leniency, may be constitutionally sufficient evidence to convict.' " *United States v. Meshack,* 225 F.3d 556, 566 (5th Cir.2000) (quoting *United States v. Westbrook,* 119 F.3d 1176, 1189-90 (5th Cir.1997)). Therefore, although it is true that much of the evidence came from the testimony of co-conspirators who had chosen to cooperate with the Government, their testimony suffices. Indeed, similar to *Meshack,* the Government's evidence implicating Thompson was voluminous. Arguments about the credibility of the Government's witnesses were presented to the jury. Such credibility determinations are for the jury, not the court, to decide. *See Meshack,* 225 F.3d at 567 n6.

***13** The Government's evidence showed that Thompson voluntarily and knowingly joined in an agreement with Mark Barney and others to distribute cocaine and possess cocaine with the intent to distribute. His involvement began with an agreement to deliver cocaine to Texas, Kansas and Colorado. He eventually became an investor, sharing in the costs and profits. His repeated trips to deliver large quantities of cocaine to Tim Wooten, who in turn distributed cocaine to others, provides sufficient evidence of an agreement. Both were intimately involved in the actual distribution of what they both knew to be cocaine. Their repeated acts furthering the distribution of cocaine manifest their knowing and voluntary participation in the conspiracy. They were also both aware that the business involved others. Indeed, they coordinated their efforts with other members of the conspiracy. Testimony from Vincent Barney and Whittaker verified that Thompson made deliveries of cocaine to Tim Wooten. Kerwin "Buddy" Wade testified that Thompson served as a courier for

his drug payments to Mark Barney. Vincent Barney also gave extensive testimony about Thompson's involvement. He testified that Thompson was primarily the drug courier who would transport packages of cocaine by plane. Vincent Barney described the system by which Thompson would pack the cocaine in his carry-on luggage to avoid detection. He testified that Thompson received about a thousand dollars for each kilogram of cocaine. According to Vincent Barney, Thompson made about twenty such trips. Mark Barney likewise discussed Ralph Thompson's involvement in the business.

Vincent Barney also testified about Tim Wooten's role as the primary distributor of cocaine in Dallas, Texas. Tim Wooten would receive the cocaine either from Thompson or by Federal Express. Vincent testified that he sent between ten and twenty shipments of drugs to Tim Wooten, ranging from two ounces to half a kilogram of cocaine. Vincent Barney also verified that he received a number of money wire transfers from Wooten as proceeds from drug transactions.

Mark Barney also testified that Tim Wooten brought Whittaker into the enterprise and that Wooten and Whittaker flew to California on one occasion to meet with Mark Barney and to receive cocaine. There was testimony that Tim Wooten delegated to Whittaker the responsibility of supplying cocaine to Gerald Wooten and Wilbert Watson. Mark Barney stated that Tim Wooten and Buddy Wade were his contacts in Texas, meaning that they were the people he sold drugs to in Texas. In addition, when Tim Wooten was arrested for drug dealing, Gerald Wooten contacted Mark Barney, who started arranging money for Tim Wooten's bail. Mark Barney also testified that Tim Wooten introduced him to a man named Lay-Low in order to facilitate a drug transaction.

The Government also presented telephone records indicating that the co-conspirators, including Tim Wooten and Ralph Thompson, communicated with each other hundreds of times. For example, there were 146 calls from numbers associated with Ralph Thompson to numbers associated with Tim Wooten. There were sixty-three calls between numbers associated with Ralph Thompson and Whittaker.

***14** The evidence was sufficient to establish that both Ralph Thompson and Tim Wooten were part of an agreement to possess cocaine with intent to distribute, that they knew about and joined the conspiracy and that their participation was voluntary.

2. Gerald Wooten

The Government's case against Gerald Wooten is weaker than that against Tim Wooten and Ralph Thompson. However, after a careful review of the record, this court finds that there was sufficient evidence for a rational trier of fact to find Gerald Wooten guilty of the drug conspiracy.

The Government presented evidence that Gerald had knowledge of the conspiracy and intended to join it. First, as discussed above, an agent testified that Gerald Wooten told him that "what he was doing [receiving one or two packages for Tim and sending funds via Western Union on Tim's or Whittaker's behalf] was a relatively minor thing and that there was little chance that he would get caught." Vincent Barney testified that he received two wire transfers from Gerald Wooten that were proceeds from a drug transaction. Vincent worked out the details of the wire transfer over the phone after contacting Gerald Wooten and based on Tim Wooten's instruction. Western Union documents confirm that these two transfers, for $2,000 and $1,425, were sent from Gerald Wooten to Vincent Barney. Mike Whittaker testified that Gerald made initial contact with Whittaker. He also testified that when he came to pick up a package of drugs, Gerald "knew why I was there" and gave him the package. Another witness, Luther Moore, testified that Gerald Wooten said that he could get drugs from Tim Wooten.

Likewise, the jury could rationally infer that Gerald Wooten voluntarily participated in the conspiracy. Whittaker testified that as he started working closer with Tim, he also started working with Gerald by providing him with drugs to sell. It was his understanding that prior to that, Tim was to supply Gerald with drugs. In addition, Whittaker testified about an incident where Tim Wooten owed a debt to Mark Barney because Gerald gave too much cocaine to someone in a drug transaction who ran off with the extra cocaine.

F. Typographical Error in the Indictment

Tim Wooten claims that the district court erred in denying his Motion for Judgment of Acquittal when he requested that the district court set aside the verdict against him on counts 12, 13, 14 and 17 because the indictment contained an incorrect date. Those counts state that Tim Wooten committed certain crimes "on or about January 4, 1994," instead of January 4, 1995.

The district court instructed the jury as follows:

> You will note that the Second Superseding Indictment charges that the offenses were committed 'on or about' a certain date. The Government does not have to prove with certainty the exact date of the alleged offense. It is sufficient if the Government proves beyond a reasonable doubt that the offense was committed on a date reasonably near the date alleged.

***15** During their deliberations, the jury sent a note to the district court asking for clarification on the dates of these counts. The district court answered the jury's note as follows:

> I cannot clarify the dates for you. I instruct you to consider all of the evidence in this case and the instructions the Court has given you, consider all of the instructions the Court has previously given you.

Rule 12(b) (2) of the Federal Rules of Criminal Procedure states that defenses and objections based on defects in the indictment must be raised before trial. "Failure to comply with this requirement results in waiver of the objection." *United States v. Lerma,* 657 F.2d 786, 790 (5th Cir.1981). Tim Wooten did not file an objection prior to trial. Moreover, even if the objection was timely, "an allegation as to the time of the offense is not an essential element of the offense charged in the indictment." *Russell v. United States,* 429 F.2d 237, 238 (5th Cir.1970). Accordingly, this court denies Tim Wooten's request for relief based on the flawed indictment.

G. Constitutionality of 18 U.S.C. § 922(g)

Tim Wooten challenges his conviction in count 12 for being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g). He acknowledges that this court's precedent affords no relief, but raises constitutional issues, albeit for the first time on appeal, merely to preserve review. They are in any event foreclosed by this court's precedent. *United States v. Rawls,* 85 F.3d 240, 242-43 (5th Cir.1996).

H. Charge against Tim Wooten for Aiding and Abetting in the Use and/or Carrying of a Firearm in Relation to a Crime of Violence

Tim Wooten contends that his conviction on count fifteen for using or carrying a silenced firearm during a crime of violence, 18 U.S.C. § 924(c)(1), is invalid under *Bailey v. United States,* 516 U.S. 137, 116 S.Ct. 501 (1995). He argues that the Government failed to meet the requirements of *Bailey* because it did not prove that he actively used or employed a gun or silencer.

Wooten ignores the fact that this count was brought against him for knowingly aiding, abetting, counseling, commanding, inducing and procuring Serdaris Jemal Preston in the use and the carrying of a firearm during and in relation to a crime of violence for which Wooten was prosecuted. *See* 18 U.S.C. § 924(c)(1) and (2). An aider and abettor need not actively use or employ the weapon. *See United States v. Wainuskis,* 138 F.3d 183, 188 (5th Cir.1998). Rather, in order for a defendant to be convicted of aiding and abetting the § 924(c)(1) offense, under the use prong, the Government must prove that he "act[ed] with the knowledge or specific intent of advancing the 'use' of the firearm in relation to the drug trafficking offense." *United States v. Sorrells,* 145 F.3d 744, 753 (5th Cir.1998). In addition, " 'there must also be proof that the defendant performed some affirmative act relating to the firearm.' " *Id.* at 754 (quoting *United States v. Giraldo,* 80 F.3d 667, 676 (2d Cir.1996) (knowledge of the presence of firearms). Wooten failed to argue, much less demonstrate, that the Government did not meet its burden with respect to Count 15. His challenge is without merit.

I. Motion in Limine for Defendant's Closing Argument

***16** At the close of trial, the Government filed a motion in limine seeking to prevent Gerald Wooten's counsel from comparing Gerald Wooten's conduct with that of other uncharged or immunized witnesses. Wooten's attorney wanted to compare his client's conduct with those who had done similar acts but were not prosecuted. This included examples of those who wired money and delivered packages to others involved in the conspiracy. Wooten argues that the court erred by not allowing his counsel to summarize this "relevant and material" evidence in a fashion that would assist his defense. He claims that this error violated his Sixth Amendment right of cross examination by effectively nullifying his cross examination of various witnesses.

The Government submits that its motion in limine was directed at preventing jury nullification, and that the district court had the power to prevent this type of argument. In particular, the motion in limine requested that the court prevent counsel for the defendants from mentioning the following:

> Any type of comparison during closing argument of the arguably criminal acts of immunized or uncharged witnesses to the alleged criminal acts of a Defendant. Such argument is objectionable in that it inherently advocates jury nullification of the Defendant's alleged criminal acts.


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

We review a district court's decision regarding closing arguments for abuse of discretion. *Bernard v. IBP, Inc. of Nebraska,* 154 F.3d 259, 266 (5th Cir.1998). "A judge has wide discretion to control the material presented by counsel in closing argument." *United States v. Taylor,* 680 F.2d 378, 380 (5th Cir.1982).

In *United States v. Leach,* this court stated in dicta that jury nullification, "the right of a jury to acquit for whatever reasons even though the evidence supports a conviction[,] is an important part of the jury trial system." 632 F.2d 1337, 1341 n. 12. (5th Cir.1980). As such, this court recognized that a jury may acquit based on its determination that the number of witnesses allowed to plead guilty to reduced charges in exchange for their testimony render it unfair to convict the defendant. *Id.* That a jury has the power to base its verdict on such a reason does not, by implication, mean that defense counsel has a right to make an argument encouraging the jury to do so. Indeed, we have noted that courts "have almost uniformly held that a criminal defendant is not entitled to an instruction that points up the existence of that practical power to his jury." *Washington v. Watkins,* 655 F.2d 1346, 1374 n. 54 (5th Cir.1981). Jury nullification is not a "right" belonging to the defendant. *United States v. Gonzalez,* 110 F.3d 936, 947-48 (2d Cir.1997).

A criminal defendant has a Sixth Amendment right to present a proper closing argument based "on the evidence and the applicable law in his favor." *United States v. Martinez,* 974 F.2d 589, 591 (5th Cir.1992). Here, Gerald's lawyer made a comprehensive closing argument without encouraging nullification. Like other circuits, we hold that the right to make closing argument does not include the right to have counsel make an improper argument encouraging the jury to use its "de facto power to refuse to apply the law as instructed by the court [and] exercise ... such power in dereliction of the jury's sworn duty." *United States v. Funches,* 135 F.3d 1405, 1408 (11th Cir.1998); *see also United States v. Thomas,* 116 F.3d 606, 614 (2d Cir.1997) ("We categorically reject the idea that, in a society committed to the rule of law, jury nullification is desirable or that courts may permit it to occur when it is within their authority to prevent."). "A trial judge ... may block defense attorneys' attempts to serenade a jury with the siren song of nullification...." *United States v. Sepulveda,* 15 F.3d 1161, 1190 (1st Cir.1993). Given that the district court forbade Gerald Wooten from mentioning only those facts that were intended to tempt jurors to violate their oaths, the district court's grant of the Government's motion was not an abuse of discretion.

J. Gerald Wooten's Requested Jury Instruction on a Lesser Included Offense

***17** Gerald Wooten was convicted on Count 3, conspiracy to distribute cocaine. He submitted jury instructions that provided for the lesser included offense of simple possession of cocaine. However, Gerald Wooten never objected to the district court's instructions that did not include his requested instruction. Where a defendant does not object to jury instructions at trial, this court reviews the instruction for plain error. *United States v. Winn,* 948 F.2d 145, 159 (5th Cir.1991). "The 'plain error' exception shall not be invoked unless when we consider the charge as a whole, we conclude that it is so clearly erroneous that the result would be a grave miscarriage of justice or seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* at 156-60.

The defendant is entitled to a lesser included offense instruction if: 1) the elements of the lesser offense are a "subset of the elements of the charged offense;" and 2) the evidence is such that "a jury could rationally find the defendant guilty of the lesser offense and not guilty of the charged offense." *United States v. Harrison,* 55 F.3d 163, 166 (5th Cir.1995). "Simple possession is not a lesser included offense of a drug conspiracy...." *United States v. Krout,* 66 F.3d 1420, 1432 (5th Cir.1995). Thus, as a matter of law, Gerald was not entitled to the lesser included offense instruction he sought. That the evidence indicated Gerald could also have been found guilty of simple possession is irrelevant.

K. Sentencing

1. Ralph Thompson

Thompson argues that the district court erred in its sentencing by finding that the murder of Frankie Dunham was reasonably foreseeable to him and holding that U.S.S.G. § 2D1.1(D) 1, 2A1.1(a) applied.

"The factual findings made by a district court in its determination of a defendant's relevant conduct for sentencing purposes are subject to the 'clearly erroneous' standard of review on appeal." *United States v. McCaskey,* 9 F.3d 368, 372 (5th Cir.1993). "The district court's sentence will be upheld so long as it results from a correct application of the guidelines to factual findings that are not clearly erroneous." *Id.*


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

The district court found that it was reasonably foreseeable to Thompson that Frankie Dunham would be killed or eliminated as a witness against Mark Barney. In particular, the district court fond that the only reasonable interpretation of the conversation about Frankie Dunham at the Hyatt Hotel in Dallas was that she needed to be eliminated. This factual finding was not clearly erroneous.

2. Gerald Wooten

Gerald Wooten submits that the district court abused its discretion when it denied him a downward departure at sentencing. Wooten incorrectly relies on *United States v. Lugman,* 130 F.3d 113 (5th Cir.1997) for the proposition that we review a requested downward departure for abuse of discretion. The correct rule is that a refusal to grant a downward departure is not reviewable unless the district court committed legal error in believing that it did not have the power to grant the downward departure. *Id.* at 115. "[W]e have no jurisdiction if the court's refusal is based on its determination that departure is not warranted on the facts of the case." *Id.* Wooten does not claim that the district court erroneously believed it could not grant the requested downward departure. He contends only that the district court abused its discretion in failing to do so. This decision is not reviewable.

3. *Apprendi*

***18** Ralph Thompson requests that this court remand his case for resentencing in light of the Supreme Court's holding in *Apprendi v.. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348 (2000). As the Appellants' briefs were due on or before June 23, 2000, they did not mention *Apprendi,* because that decision had not yet been issued by the Supreme Court. Nevertheless, *Apprendi* was decided on *June 26, 2000,* yet Thompson then waited until October 27, 2000, to file a letter citing supplemental authority. Both Thompson and the Government submitted supplemental briefs addressing this issue at the court's request after oral argument on November 6, 2000.

Federal Rule of Appellate Procedure 28(j) permits a party to file supplemental materials if pertinent authorities come to a party's attention after the party's brief has been filed. However, the Rule states that the party must do so "promptly." Fed. R.App. Proc. 28(j). Thompson's initial filing on this issue was not prompt. As a result, we are inclined to deem this argument waived.

Nonetheless, on the merits, Thompson's *Apprendi* argument must fail. He did not object in the trial court to an alleged failure to instruct the jury on a material issue in the crimes he was charged with. Appellate review, therefore, takes place under the plain error standard. The demanding plain error standard leaves this court with discretion not to reverse unless the error " 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.' " *Meshack,* 225 F.3d at 577 (quoting *United States v. Franks,* 46 F.3d 402, 404 (5th Cir.1995)). We would so exercise our discretion here. There was no dispute at trial that the quantity of cocaine involved in the offense was greater than 5 kilograms, which alone justifies his life sentence. *See* 21 U.S.C. § 841(b)(1)(A)(ii); 21 U.S.C. § 846. "No 'miscarriage of justice' will result here if we do not notice the error." *Johnson v. United States,* 520 U.S. 461, 467, 117 S.Ct. 1544, 1550 (1997) (quoting *United States v. Olano,* 507 U.S. 725, 736, 113 S.Ct. 1770, 1779 (1993)).

CONCLUSION

For the foregoing reasons, this court AFFIRMS the convictions and sentences of the three Appellants.

AFFIRMED.

I concur in all of Judge Jones' cogent opinion except insofar as it deals with the denial of Gerald Wooten's motion for severance. While I have no disagreement with the majority's explication of the general rules related to this issue, I am unable to agree with their application of those principles to the particular facts of Gerald Wooten's case.

Of the seventeen counts which went to trial, thirteen involved violence, including three murders and two attempted murders, and two were felon in possession of firearm and possession of an unregistered silencer. Gerald Wooten was not charged in any of these counts, but only with conspiracy to distribute cocaine and money laundering conspiracy, neither of which counts alleged any violence or attempted violence or weapons possession. The evidence to sustain Gerald Wooten's conviction on these two counts though minimally adequate was thin indeed and at most tended to show that he was a minor, local player in those endeavors. At trial, the government improperly tried to insinuate that Gerald Wooten may have been connected to the murders and attempted murders of the Oklahomans, because shortly after those events his brother, who was complicit in those offenses, called Gerald Wooten's phone number, and this was emphasized in

the government's closing argument. Surely, in any trial on only the counts charging Gerald Wooten, this evidence and the related argument would have been excluded as irrelevant or at least under Fed.R.Evid. 403. In this setting, it was impossible for Gerald Wooten to receive a fair trial, and it is evident that he was severely prejudiced by the denial of his motion for severance. *See, e.g., U.S. v. DiNome,* 954 F.2d 839, 844-45 (2d Cir.1992).

***19** In my opinion, the trial court abused its discretion in denying Gerald Wooten's motion for severance, and we should for this reason reverse Gerald Wooten's conviction and remand the case against him for a new trial. I respectfully dissent from the majority's holding to the contrary.

**All Citations**

253 F.3d 700, 2001 WL 498430

## Footnotes

* Circuit Judge of the Ninth Circuit, sitting by designation.

** Pursuant to 5th Cir. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Cir. R. 47.5.4.

1 The counts in the indictment are follows: (1) RICO, 18 U.S.C. § 1962(c); (2) RICO conspiracy, 18 U.S.C. § 1962(d); (3) conspiracy to distribute cocaine, 21 U.S.C. § 846; (4) conspiracy to commit murder in aid of racketeering activity, 18 U.S.C. § 1959(a)(5); (5) interstate travel for murder for hire-victim Edgar Reece, Jr., 18 U.S.C. § 1958, and aiding and abetting, 18 U.S.C. § 2; (6) interstate travel for murder for hire-victim Fasha Norman, 18 U.S.C. § 1958, and aiding and abetting, 18 U.S.C. § 2; (7) interstate travel for murder for hire-victim Harvey Lee Gabriel, 18 U.S.C. § 1958 and aiding and abetting, 18 U.S.C. § 2; (8) interstate travel for murder for hire-victim Keno Fletcher, 18 U.S.C. § 1958, and aiding and abetting, 18 U.S.C. § 2; (9) violent crime (murder) in aid of racketeering activity-victim Edgar Reece, Jr., 18 U.S.C. § 1959(a)(1); aiding and abetting, 18 U.S.C. § 2; (10) violent crime (murder) in aid of racketeering activity-victim Fasha Norman, 18 U.S .C. § 1959(a)(1), aiding and abetting, 18 U.S.C. § 2; (11) use or carrying a firearm during a crime of violence (murder), 18 U.S.C. § 924(c)(1), aiding and abetting, 18 U.S.C. § 2; (12) felony in possession of a firearm, 18 U.S.C. § 922(g) aiding and abetting, 18 U.S.C. § 2; (13) violent crime (assault with a dangerous weapon/assault causing bodily injury) in aid of racketeering activity-victim Harvey Lee Gabriel, 18 U.S.C. § 1959(a)(3), aiding and abetting, 18 U.S.C. § 2; (14) violent crime (assault with a dangerous weapon) in aid of racketeering activity-victim Keno Fletcher, 18 U.S.C. § 1959(a)(3), aiding and abetting, 18 U.S.C. § 2; (15) using or carrying a silenced firearm during a crime of violence, 18 U.S.C. § 924(c)(1), aiding and abetting, 18 U.S.C. § 2; (16) Possession of an unregistered firearm (silencer), 18 U.S.C. § 5861(d); aiding and abetting, 18 U.S.C. § 2; (17) money laundering conspiracy, 18 U.S.C. § 1956(h); (18) obstruction of justice, 18 U.S .C. § 1503.

2 Specifically, Mark Barney testified that Tim Wooten told Barney and Thompson about the murders a day or so after they occurred, on January 6, 1996. Thompson was with Mark Barney, Tim Wooten and Whittaker in a hotel room when a plot to murder Preston was discussed. Likewise, the need to silence Frankie Dunham was discussed in Thompson's presence.

3 *Bledsoe* holds that an enterprise must have three elements: 1) a common or shared purpose; 2) continuity of structure and personality; and 3) an " 'ascertainable structure' distinct from that inherent in the conduct of a pattern of racketeering activity." *Bledsoe,* 674 F.2d at 665.

4 For example, Ralph Thompson occasionally profited by investing his own money into the overall price that Mark Barney paid for the cocaine. He would "invest" by putting in a certain percent of the price and paying that share of the overall cost of the transaction. In turn, he would receive the same percent of the profits.

5 The Government believes that it has also provided sufficient evidence for an open-ended concept. As to the open-ended concept, the Government asks that this court follow *United States v. Richardson,* 167 F.3d 621, 625-26 (D.C. Cir1999) which held that although a defendant's four predicate acts spanned only thirty-four days and the entire crime spree only three and one-half months, the " 'fortuitous interruption of [racketeering] activity such as by an arrest' does not grant defendants a free pass to evade RICO charges." *Id.* (quoting *United States v. Busacca,* 966 F.2d 232, 236 (6th Cir.1991)). The court held that the defendant's pre-arrest conduct was of such frequency and increasing seriousness that a jury

could find that the predicate acts of racketeering, by their very nature, "projected into the future with a threat of repetition." *Id.* Because we find that the Government satisfied its burden under the closed-ended concept, we need not address whether the open-ended concept applies.

6 Tim Wooten relies on *Richardson v. United States,* 526 U.S. 813, 119 S.Ct. 1707 (1999), where the Supreme Court held that the Continuing Criminal Enterprise States (the "CCE" statute), which requires that the Government prove that a current drug violation "is a part of continuing series of violations," 21 U.S.C. § 848(a), requires that the jury unanimously agree about which specific violations the defendant had committed. *Richardson* is inapplicable to our review of the verdict form in this RICO case. *See generally* *United States v. Meshack,* 225 F.3d 556, 580 (5th Cir.2000) (finding that *Richardson* is generally inapplicable to a money laundering statute). First, the Court's conclusion was *based on* an extensive statutory analysis of the CCE statute. Second, the *Richardson* defendant's request for a specific unanimity instruction, not for a special verdict form, was at issue. Here, there is no contention that the judge did not give the appropriate unanimity instruction.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit I

2023 WL 8179273
Only the Westlaw citation is currently available.
United States Court of Appeals, Fifth Circuit.

UNITED STATES of America, Plaintiff—Appellee,
v.
William B. HUNGERFORD, Jr., Defendant—Appellant.

No. 21-30359
|
FILED November 27, 2023

Appeal from the United States District Court for the Eastern District of Louisiana, USDC No. 2:18-CR-112-1

**Attorneys and Law Firms**

Kevin G. Boitmann, Diane Hollenshead Copes, Esq., Assistant U.S. Attorneys, Kyle Daly (argued), U.S. Attorney's Office, New Orleans, LA, for Plaintiff—Appellee.

Celia Clary Rhoads (argued), Esq., Federal Public Defender's Office, New Orleans, LA, for Defendant—Appellant.

Before Willett, Engelhardt, and Oldham, Circuit Judges.

**Opinion**

Per Curiam:*

***1** William B. Hungerford challenges his conviction on nine counts of various forms of fraud and money laundering. He raises twelve alleged trial errors. We find no reversible error and affirm.

I.

A.

The crimes in this case arise from a federal foreign investment program known as "EB-5." United States Citizenship and Immigration Services ("USCIS") uses the EB-5 program to offer wealthy aliens a pathway to permanent residence. Alien investors must invest $1,000,000 of capital in a qualified business, maintain that investment for at least two years, and show that the investment created at least ten American jobs by the end of the two-year period. **ROA.8442–3**. But if the alien investors send their capital to targeted employment areas—rural areas or high unemployment areas in need of economic investment, like New Orleans after Hurricane Katrina—then the EB-5 program only requires a $500,000 investment. **ROA.8443.** The program also allows investors to contribute their capital to "Regional Centers" that pool investor capital to promote growth in a particular geographic region. **ROA.2062**. Aliens who invest money in creating American jobs in accordance with the EB-5 rules can apply for permanent residence.

Three immigration forms play important roles in the EB-5 program. The first is the I-526. An immigrant investor files an I-526 petition to enter the United States as a conditional permanent resident. The I-526 requires the immigrant investor to show that he has made the required investment in the United States and to submit a business plan for creating the required American jobs. After USCIS approves the I-526 petition, the immigrant investor receives conditional permanent residence status (colloquially called a "temporary green card") for two years. At the end of the two-year investment period, the investor may file an I-829 petition for removal of conditions on their residency (colloquially called a "permanent green card"). The I-829 requires the immigrant investor to show that he did not receive any of the invested money back and that the required jobs were in fact created. The final form that is important for this case is the I-924. The I-924 is an annual report filed by a Regional Center. The Regional Center uses that form to certify to USCIS that it continues to meet the EB-5 eligibility criteria by promoting growth and jobs in its designated region.

B.

Hungerford and his partner, Timothy Milbrath, opened the New Orleans Regional Center ("the Center") as part of the EB-5 program. They operated the Center from 2007 until 2012. **ROA.5730–33, 9543.** Hungerford and Milbrath ran the Center through their company, NobleOutReach, LLC ("NOR"). **ROA.3638.** NOR served as "an umbrella entity" over the Center's portfolio projects. And those portfolio projects were the purportedly job creating entities ("JCEs") that would ultimately satisfy the EB-5 program's job-creation requirements. **ROA.8442.**

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

Hungerford and Milbrath recruited forty-six aliens to invest with the Center. Thirty-one of those aliens submitted I-526 petitions for temporary green cards via the EB-5 program. **ROA.13114.** The documents NOR prepared for the investor petitions included assurances that the Center's JCEs would be located within Orleans Parish and that the minimum investor capital ($500,000 per investor) would be invested within the geographic boundaries of the New Orleans targeted employment area. **ROA.10692–94.**

***2** As it turns out, however, Hungerford and Milbrath did not invest the aliens' money to create jobs in New Orleans; they instead used that money to enrich themselves. Hungerford and Milbrath established Bay-Nola-Management ("BNM") as a purportedly New Orleans-based JCE. BNM purported to provide "marketing, financial management, due diligence and business analysis" in New Orleans. **ROA.8587.** And in NOR's required I-924 annual reports to USCIS, signed by Hungerford under penalty of perjury, NOR claimed BNM performed "Food Service" and "Construction," and listed BNM's and NOR's addresses as in New Orleans. **E.g., ROA.2130, 2367–69.** But BNM operated primarily out of Maryland, where Hungerford and Milbrath lived, not out of New Orleans. Mail addressed to BNM went to a New Orleans address, only to be forwarded to the Maryland office. **ROA.2359.** And there is no evidence that BNM actually created jobs in New Orleans, or that BNM was anything more than a pass-through entity for funneling money back to Hungerford and Milbrath via their corporate alter ego, NOR.

The fraud came to light when the thirty-one alien investors filed their I-829 petitions for permanent green cards. USCIS denied the aliens' petitions on the grounds that NOR could not sufficiently demonstrate that the investors' funds had been used in New Orleans. **ROA.3659; 12116–19.** In 2012, several investors sued NOR based on their lost investment and denied immigration petitions. Despite the suit, Hungerford and Milbrath continued to file quarterly reports with the city of New Orleans, reaffirming that their remaining capital was still invested in New Orleans, and NOR continued to hold property in New Orleans. **ROA.7956–8027, 8028–99, 8100–71, 8173–8247.** NOR finally sold one property, Maurepas Foods, in 2016, but Hungerford and Milbrath split the proceeds ($120,000 each), rather than reinvesting the money in New Orleans. **ROA.13365; 13395–96**.

In 2018, a grand jury indicted Hungerford and Milbrath with nine counts: three counts of conspiracy to commit mail/wire fraud, immigration fraud, and money laundering and six counts of substantive wire fraud. After a three-week trial, the jury convicted both defendants on all counts. Hungerford timely appealed.[1]

II.

Hungerford raises twelve alleged trial errors.[2] We divide them into four categories: (A) four sufficiency-of-the-evidence challenges, (B) a constructive-amendment-of-the-indictment claim, (C) three improper-witness-testimony challenges, and (D) four jury-instruction claims. He also claims that (E) even if no individual error is reversible, their cumulative effect is. We address each category in turn.

A.

Hungerford properly preserved his sufficiency objections. Therefore, our review is *de novo* but with "great deference" to the jury's verdict. *United States v. Churchwell*, 807 F.3d 107, 114 (5th Cir. 2015). This court "must affirm a conviction if, after viewing the evidence and all reasonable inferences in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Jordan*, 945 F.3d 245, 255 (5th Cir. 2019) (emphasis omitted) (quotations omitted); *see also* *United States v. Sanders*, 952 F.3d 263, 273 (5th Cir. 2020).

***3** Hungerford challenges (1) the conspiracy convictions and (2) the substantive wire fraud convictions based on the sufficiency of the evidence.

1.

First, Hungerford says the Government introduced insufficient evidence that he conspired with Milbrath. To sustain a conspiracy conviction, "the Government must prove (1) an agreement between two or more persons to pursue an unlawful objective; (2) the defendant's knowledge of the unlawful objective and voluntary agreement to join the conspiracy; and (3) an overt act by one or more of the members of the conspiracy in furtherance of the objective of the conspiracy." *United States v. Mann*, 493 F.3d 484, 492 (5th Cir. 2007) (quoting *United States v. Floyd*, 343 F.3d 363, 370 (5th Cir. 2003)); *see also* *United States v. Fiero*, 38 F.3d


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

761, 768 (5th Cir. 1994) (listing five elements of conspiracy to launder money that are represented by the three elements in *Mann*). Mail and wire fraud conspiracies require these same elements, except that they do not require an overt act. *See* *United States v. Kuhrt*, 788 F.3d 403, 414 (5th Cir. 2015).

In proving these elements, the Government may rely on indirect evidence. "An agreement may be inferred from concert of action, voluntary participation may be inferred from a collection of circumstances, and knowledge may be inferred from surrounding circumstances." *United States v. Simpson*, 741 F.3d 539, 547 (5th Cir. 2014) (citation omitted). The upshot: "Direct evidence of a conspiracy is unnecessary; each element may be inferred from circumstantial evidence." *United States v. Fuchs*, 467 F.3d 889, 907 (5th Cir. 2006) (citation omitted).

The record easily contains sufficient evidence to prove that Hungerford conspired to commit mail and wire fraud, immigration fraud, and money laundering. *See* 18 U.S.C. § 1349 (conspiracy to commit mail or wire fraud); *id.* § 371 (general federal conspiracy, here applied to the immigration fraud); *id.* § 1956(h) (conspiracy to launder money). In fact, the record *teems* with such evidence, so any attempt to describe it would be woefully underinclusive. To hit just some highlights: Both Hungerford and Milbrath received equal payments from NOR, owned a 50% share of NOR, and, most importantly, each engaged in behavior to further the conspiracy, to enrich themselves with millions of dollars, and to conceal the conspiracy. They created circular transactions to move money into their pockets and then omitted those transactions from USCIS filings to deceive the Government. And both knew that their actions were unlawful under the constraints of the EB-5 program—USCIS told them several times that the investors' $500,000 contributions could *only* go toward investments in New Orleans. Moreover, Hungerford conspired with Milbrath to cause immigrant investors to submit fraudulent immigration forms. *See* *United States v. Elashyi*, 554 F.3d 480, 497 (5th Cir. 2008) (holding conspiracy to make false statement can be proved where defendant conspired to cause a third party to make it). And Hungerford signed under penalty of perjury I-924 annual reports that he knew were fraudulent because BNM did not perform "Food Service" and "Construction" in New Orleans.

***4** The Government therefore presented sufficient evidence to convict Hungerford on each conspiracy charge.

2.

Hungerford next challenges his substantive wire fraud convictions. "The elements of wire fraud under 18 U.S.C. § 1343 are: (1) a scheme to defraud and (2) the use of, or causing the use of, wire communications in furtherance of the scheme." *Simpson*, 741 F.3d at 547–48 (quotation omitted). Hungerford's wire fraud convictions were based on five quarterly report emails he filed with the city of New Orleans and one sale of an NOR-held property, Maurepas Foods. **ROA.145–46; ROA.7886–955, 7956–8027, 8028–99, 8100–71, 8173–247; ROA.13365–69.**

To satisfy § 1343, the fraudulent wire need only be "incident to an essential part of the scheme [to defraud] or a step in the plot." *United States v. Barraza*, 655 F.3d 375, 383 (5th Cir. 2011) (alteration adopted) (quoting *Schmuck v. United States*, 489 U.S. 705, 710–11 (1989)). And wires that conceal or delay detection of an ended scheme can be considered essential to the scheme. *See* *United States v. Bowman*, 783 F.2d 1192, 1197 (5th Cir. 1986). That is because "actions taken to avoid detection, or to lull the fraud victim into complacency, can further the fraud." *United States v. Allen*, 76 F.3d 1348, 1363 (5th Cir. 1996) (citing *United States v. Maze*, 414 U.S. 395, 402–03 (1974)).

Here, each of Hungerford's five email reports contained assurances that the EB-5 investments were still located in New Orleans and that NOR was pursuing the Center's goals. *See* **ROA.7886–955, 7956–8027, 8028–99, 8100–71, 8173–247; *see also* ROA.2701–14.** But trial evidence showed that substantial portions of the investments were actually in Maryland or in the defendants' pockets and that no significant work had been done in New Orleans for years. And the property sale was an even more direct piece of the scheme to defraud. Although the sale proceeds initially went to an NOR holding, they never got reinvested in New Orleans. Instead, Hungerford and Milbrath split them 50/50. A reasonable jury could certainly have found that Hungerford meant these wires to lull the city into believing that the Center was still investing in New Orleans while he wrapped up the loose ends of his scheme. Therefore, there was sufficient evidence to support his convictions for substantive wire fraud.

B.


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Hungerford did not raise his constructive-amendment or material-variance claim to the district court, so we review the claim for plain error. *See United States v. Broadnax*, 601 F.3d 336, 340 (5th Cir. 2010). Under plain error, "[t]he defendant must show that (1) the district court committed an error, (2) the error is plain, (3) the error affects his substantial rights, and (4) failure to correct the error would seriously affect the fairness, integrity, or public reputation of judicial proceedings." *United States v. del Carpio Frescas*, 932 F.3d 324, 332 (5th Cir. 2019) (per curiam) (citation omitted). Thus, "[r]elief under the plain-error standard 'will be difficult to get, as it should be.' " *United States v. Figueroa-Coello*, 920 F.3d 260, 264 (5th Cir. 2019) (quoting *United States v. Dominguez Benitez*, 542 U.S. 74, 83 n. 9 (2004)).

***5** "A constructive amendment occurs when the government changes its theory at trial, allowing the jury to convict on a broader basis than that alleged in the indictment, or ... proves an essential element of the crime on an alternate basis ... not charged in the indictment." *United States v. Stanford*, 805 F.3d 557, 565 (5th Cir. 2015) (citation omitted). Its less-severe sibling, a material variance, "occurs when the proof at trial depicts a scenario that differs materially from the scenario charged in the indictment but does not modify an essential element of the charged offense." *United States v. Rodriguez*, 553 F.3d 380, 392 (5th Cir. 2008) (citation omitted). Generally, constructive amendments are reversible error per se, while material variances are reviewed for harmless error. *See United States v. Jara-Favela*, 686 F.3d 289, 299 (5th Cir. 2012). But under plain error review, even if a difference between the indictment and the proof at trial constituted a constructive amendment, we will reverse only if the amendment was also a clear or obvious error that affected the defendant's substantial rights and meets our discretionary threshold. *See Broadnax*, 601 F.3d at 340.

In determining what represents an amendment, the constructive amendment rules lie on top of rules governing the specificity of indictments. In general, "[a]n indictment is not required to expressly set out every action of the defendant which may have contributed to the commission of the crime charged. Rather, the chief purposes of an indictment are to apprise the defendant of the specific charges he will be asked to rebut at trial and to protect him against double jeopardy." *United States v. Moree*, 897 F.2d 1329, 1333–34 (5th Cir. 1990) (citation omitted). If the indictment specifies "one particular kind of falsity ... [then] a conviction must rest on that charge." *United States v. Adams*, 778 F.2d 1117, 1125 (5th Cir. 1985). Thus, whether it is an error to allow the Government to present new or different evidence from that specified in the indictment turns on both the contents of the indictment and the degree of difference between the charges and the evidence at trial.

Similarly, the constructive amendment doctrine serves chiefly to protect defendants from unfair surprise evidence at trial and from successive prosecutions for the same offense based on different evidence. *See Berger v. United States*, 295 U.S. 78, 82 (1935) ("The general rule that allegations and proof must correspond is based upon the obvious requirements (1) that the accused shall be definitely informed as to the charges against him, so that he may be enabled to present his defense and not be taken by surprise by the evidence offered at the trial; and (2) that he may be protected against another prosecution for the same offense." (citation omitted)). If any amendment did not affect one of these two substantial rights, then we cannot say that it was plain error for the district court to allow evidence outside of the indictment.

Here, Hungerford contends that the prosecution constructively amended or materially varied from the immigration fraud charge levied by the grand jury by introducing I-924 annual reports that Hungerford signed under penalty of perjury and submitted to USCIS to demonstrate compliance with the EB-5 program. True, the indictment mentions two immigration forms required by the EB-5 program (the I-526 and I-829 petitions, which immigrant investors submit to adjust their immigration statuses) and does not mention I-924s. But Hungerford cannot show that the omission satisfies the high bar for plain-error relief.

First, there was no risk of unfair surprise. The grand jury indicted Hungerford and Milbrath for "knowingly and willfully combin[ing], conspir[ing] and agree[ing] to make and cause to be made material false statements under oath and penalty of perjury on an application or other document required by the immigration laws or regulations of the United States, in violation of Title 18, United States Code, Section 1546(a); all in violation of Title 18, United States Code, Section 371." **ROA.143.** The indictment further charged Hungerford with conspiring to make false "statements" (plural) on "an application or other document." **ROA.143.** Hungerford knew that the EB-5 program included several kinds of documents, including the I-924, and he knew that he had submitted the fraudulent I-924s. And he points to no case requiring an indictment to list each piece of evidence the Government will use to prove an indictment's allegations.


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

As such, there was no fairness violation in introducing the I-924s.

***6** Second, there was no risk of a second prosecution. Because the overarching charge was the conspiracy to commit immigration fraud, not the substantive crime of immigration fraud, there was no risk that leaving the I-924 forms out of the indictment would subject Hungerford to the risk of another prosecution based on the I-924 forms alone. The conspiracy charge covered the scheme as a whole, of which the I-924 forms were only a piece. That the district court allowed them to be introduced here arguably *protects* Hungerford from a future prosecution for this same scheme.

Thus, it is unclear there was any error. Even if there were, any error was not plain or obvious because none of our constructive-amendment or material-variance cases compel a finding of error here. And even if there were a plain error, Hungerford cannot show that he was prejudiced—much less that we should exercise our discretion to award relief.

C.

Hungerford next alleges three evidentiary errors: (1) improper admission of hearsay evidence, (2) improper lay-witness testimony, and (3) improper summary-witness testimony. Hungerford raised his hearsay objection below, so we review it for abuse of discretion, "subject to the harmless error rule." *Jordan*, 945 F.3d at 257; *United States v. Ragsdale*, 426 F.3d 765, 774–75 (5th Cir. 2005). But Hungerford failed to raise his lay-witness objection below, so there we review for plain error. *See Jordan*, 945 F.3d at 258. Finally, the parties dispute whether Hungerford sufficiently preserved his objection to the summary-witness testimony. The dispute does not matter because Hungerford's claim fails in any event.

1.

First, hearsay. Hungerford objected to the prosecution's introduction of out-of-court statements by Morrie Berez, a USCIS official-turned-NOR-consultant, concerning the legal requirements for running the Center. Although Berez did not testify, other witnesses offered a series of his comments, primarily in emails and documents, as evidence that Hungerford and Milbrath knew that their conduct was unlawful. Hungerford contends that these statements were inadmissible and that allowing them to be introduced constituted an abuse of discretion.

The district court did not abuse its discretion in allowing these statements because the statements were not hearsay. *See* Fed. R. Evid. 801(c)(2) (" 'Hearsay' means a statement that ... a party offers in evidence to prove the truth of the matter asserted in the statement."). Simply put, the prosecution did not offer Berez's statements for the truth of the matter asserted; instead, the prosecution argued that the statements went to Hungerford's knowledge that his conduct was illegal. **ROA.2410;** *see United States v. Chavis*, 772 F.2d 100, 106 (5th Cir. 1985). That is not hearsay, and hence it was not an abuse of discretion to admit the statements.

2.

Second, lay witness Jan Lyons's testimony. Lyons was a USCIS official. Hungerford argues the Government improperly used Lyons to introduce legal opinions about USCIS's regulations and the agency's understanding of its own rules. Most importantly, Lyons testified to USCIS's interpretation of the EB-5 program, the regional center program, and its own guidelines. **ROA.2063, 2070, 2129.** But Hungerford did not object to Lyons's testimony on these grounds below, so we review the testimony for plain error.

"If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. Under Rule 701, "[i]t is ... generally prohibited for a lay witness to interpret statutes and to give legal opinions." *United States v. El-Mezain*, 664 F.3d 467, 511 (5th Cir. 2011).

***7** Even if the district court committed plain error in admitting Lyons's testimony, Hungerford cannot show prejudice. Many of the conclusions from Lyons's testimony were repeated in other testimony and evidence. For example, perhaps the most important conclusion from Lyons—that Hungerford and Milbrath could not use the alien investors' $500,000 EB-5 funds for anything other than investment in the New Orleans JCEs—also appeared in Milbrath's book interview, **ROA.6270**, in the USCIS letter responding to the first temporary green card petition, **ROA.11985**, in NOR's response to that letter, **ROA.12051**, and in testimony from


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

investors, **ROA.1035–36**. Although Lyons's testimony was no doubt important, Hungerford cannot show a reasonable probability that, but for Lyons's testimony, Hungerford would have been acquitted. *Cf. United States v. Mims*, 992 F.3d 406, 409 (5th Cir. 2021) (requiring a "reasonable probability of a different outcome absent the error" in plain error review of a sentencing error). Therefore, allowing Lyons's testimony was not reversible plain error.

3.

Third, summary witness Yvonne Evans's testimony. Here too, Hungerford cannot show that the district court committed a reversible error under any standard of review.

The Federal Rules of Evidence allow witnesses to "use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." Fed. R. Evid. 1006. Our precedent allows parties to call witnesses to summarize large volumes of evidence. *United States v. Nicholson*, 961 F.3d 328, 335 (5th Cir. 2020) (citing *United States v. Baker*, 923 F.3d 390, 397 (5th Cir. 2019)). As a general rule, summary witnesses of this kind are not supposed to introduce evidence that has not previously been presented to the jury. *Ibid.* There is no clear line between what constitutes fact-witness testimony and summary-witness testimony. *See United States v. Hart*, 295 F.3d 451, 457 (5th Cir. 2002); *United States v. Lucas*, 849 F.3d 638, 644–45 (5th Cir. 2017). Moreover, we have not held that a summary witness cannot *also* serve as a fact witness. *See Nicholson*, 961 F.3d at 335 (describing a witness as both).

Hungerford cannot show reversible error under any standard. The parties stipulated to the authenticity of the evidence that Evans reviewed, such as financial documents. **ROA.2680.** Insofar as Evans summarized that evidence, her testimony was admissible under *Nicholson.* And insofar as Evans strayed beyond that evidence to testify about new facts, Hungerford has not shown that Evans could not serve as both a fact witness and a summary witness.

D.

Preserved objections to jury instructions are reviewed for abuse of discretion. *United States v. Green*, 47 F.4th 279, 288 (5th Cir. 2022). We will find such an abuse only where "the defendant's requested instructions '(1) are substantively correct; (2) are not substantially covered in the charge given to the jury; and (3) concern an important point in the trial so that the failure to give them seriously impairs the defendant's ability to present effectively a particular defense.' " *United States v. Hale*, 685 F.3d 522, 541 (5th Cir. 2012) (alterations omitted). Moreover, we will vacate a conviction only if the requested instruction would have led to an acquittal. *Id.* at 541–42. Meanwhile, challenges raised only on motion for new trial or afterward are reviewed for plain error. *Id.* at 540.

Hungerford offered alternate instructions for his (1) estoppel instruction claim but did not object to the trial court's instructions for his (2) ignorance of the law instruction, (3) deliberate ignorance instruction, or (4) failure to cure jury confusion claims. Therefore, we review the first argument for abuse of discretion but the rest for plain error.

1.

Hungerford requested an estoppel instruction on the basis that USCIS had "approved" of Hungerford and Milbrath's conduct. That instruction read:

> The defendants assert the defense of equitable estoppel, on the grounds that the United States Customs and Immigration Service approved of their conduct in operating the immigrant investor program. The Constitution does not permit convictions to be obtained if the government has assured the defendant that his or her conduct is permissible. If you find that the USCIS approved of the defendants' conduct in operating the immigrant investor program, you must find them not guilty....

***8 ROA.423.**

"The defense of entrapment by estoppel is applicable when a government official or agent *actively assures* a defendant that certain conduct is legal and the defendant reasonably relies on that advice and continues or initiates the conduct." *United States v. Spires*, 79 F.3d 464, 466 (5th Cir. 1996) (emphasis added); *see also United States v. Treviño-Martinez*, 86 F.3d 65, 69 (1996) ("the government must *actively mislead* the defendant ..." (emphasis added)); *United States v. Cornejo-Flores*, 254 F.3d 1082 (5th Cir. 2001) (table case) (per curiam) (requiring "an affirmative misrepresentation" by an official). This rule emphasizes that mere approval by a government official is insufficient to entitle defendants to an estoppel defense. Hungerford's proffered instruction did not track


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

our rule, and therefore, the district court did not abuse its discretion in refusing it.

2.

Hungerford next contends that the district court plainly erred in issuing an instruction that read: "Ignorance of the law or even a mistake of law is not a defense." **ROA.4079.** Hungerford points to two potential defects in the instruction. First, he argues that the "maxim" that "ignorance of the law is no excuse" is subject to exceptions where a mistake of law eliminates the specific intent to commit a criminal act. **Blue Br. 79.** Second, Hungerford argues that even if the instruction was correct, it effectively negated the following good-faith-defense instruction.

In its entirety, the disputed instruction says:

> It is not necessary for the government to prove the defendants knew that a particular act or failure to act is a violation of the law. Ignorance of the law or even a mistake of law is not a defense. The defendants are entitled to a defense of good faith as a bar to a finding of criminal intent. Where 'intent to defraud' is a specific element of the count charged, it follows that a defendant who acts in 'good faith' cannot have the criminal intent required to commit these acts. Thus, if you find that any defendant acted in good faith in connection with the 'schemes to defraud' alleged by the government, you must find the defendants not guilty of these charges.

**ROA.4079.** Hungerford is quite right that it would constitute legal error to instruct the jury that ignorance of the law is no excuse because ignorance *can* be an excuse. *See, e.g., Rehaif v. United States*, 139 S. Ct. 2191, 2198 (2019). But Hungerford is wrong to focus on the "ignorance of the law" sentence in isolation because the rest of the instruction specifies that good-faith ignorance can negate intent. We cannot say this instruction, taken as a whole, constituted a clearly erroneous statement of the law.

But even assuming that the instruction was erroneous, there is little to suggest that it affected Hungerford's substantial rights. The prosecution offered substantial evidence of Hungerford's fraudulent scheme, and Hungerford responded with attempts to negate the specific intent element of his charges. And the trial court further clarified the jury instructions by reemphasizing the importance of the specific intent element, stating "if the evidence in this case leaves you with a reasonable doubt as to whether the defendants acted with an intent to defraud, then you must find them not guilty." **ROA.4079.** The jury therefore had ample opportunity to consider Hungerford's defense, and so he cannot show that this alleged error impacted his substantial rights.

3.

***9** Hungerford next argues that the district court plainly erred by giving a deliberate-ignorance instruction. A deliberate-ignorance instruction allows the jury to find that the defendant knew a fact if the defendant deliberately turned a "blind eye" to it. To warrant a deliberate-ignorance instruction, the trial record must support "inferences that (1) the defendant was subjectively aware of a high probability of the existence of illegal conduct; and (2) the defendant purposely contrived to avoid learning of the illegal conduct." *United States v. Oti*, 872 F.3d 678, 697 (5th Cir. 2017) (citation omitted). In making that fact-based determination, "the court reviews the evidence and all reasonable inferences that may be drawn therefrom in the light most favorable to the government." *Id.*

Here, viewed in the light most favorable to the Government, the record supported the instruction. At a bare minimum, there was sufficient evidence that Milbrath deliberately ignored evidence of Hungerford's fraudulent conduct, such as backdating invoices. Because the two defendants were tried together, we cannot say that it was clear or obvious error to issue the deliberate ignorance instruction based on this evidence.

4.

Finally, Hungerford argues that the trial judge erred in referring the jury back to the original instructions when the jury sent a note expressing its confusion about the term "cause." Hungerford's counsel affirmatively consented to the district court's response, **ROA.4112**, which forecloses our review. *See United States v. Musquiz*, 45 F.3d 927, 931 (5th Cir. 1995) ("Waived errors are entirely unreviewable, unlike forfeited errors, which are reviewable for plain error.").

But even if we could review for plain error, we would find none. "[A] trial judge, of course, enjoys wide latitude in deciding how to respond to such questions." *United States v. Stevens*, 38 F.3d 167, 170 (5th Cir. 1994) (citation


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

omitted). In reviewing a trial judge's instructions, "we ask whether the court's answer was reasonably responsive to the jury's question and whether the original and supplemental instructions [if any] as a whole allowed the jury to understand the issue presented to it." *Id.* Finally, it is not an error to refer the jury back to the original instructions "if the original charge is an accurate statement of the law." *United States v. Marshall*, 283 F. App'x 268, 279 (5th Cir. 2008) (citing *United States v. Arnold*, 416 F.3d 349, 359 n.13 (5th Cir. 2005)).

Here, the original instructions defined "to cause" as "to cause interstate wire communications facilities is to do an act with knowledge that the use of the wire communications facilities will follow in the ordinary course of business or where such use can reasonably be foreseen." **ROA.4085, 4112.** This is an accurate statement of the law under the wire fraud statute. *See Pereira v. United States*, 347 U.S. 1, 8–9 (1954) (using this definition of "cause" in the context of mail fraud). Therefore, it was not an error (much less plain error) to refer the jury back to the original instruction.

E.

Hungerford's final argument is that, even if his other claims fail individually, they succeed cumulatively. To prove reversible cumulative error, Hungerford must show that the alleged errors "so fatally infect[ed] the trial that they violated the trial's fundamental fairness." *Oti*, 872 F.3d at 690 n.10 (quoting *United States v. Delgado*, 672 F.3d 320, 344 (5th Cir. 2012)). Hungerford cannot make that showing. The evidence of Hungerford's guilt was overwhelming. And he cannot show prejudice from any of his alleged errors.

AFFIRMED.

**All Citations**

Not Reported in Fed. Rptr., 2023 WL 8179273

Footnotes

* This opinion is not designated for publication. See 5th Cir. R. 47.5.

1 Milbrath died in custody after filing his opening brief in this appeal.

2 The twelve alleged errors are: insufficiency of the evidence for the (1) mail and wire fraud, (2) immigration fraud, and (3) money laundering conspiracies; (4) insufficiency of the evidence for the substantive wire fraud counts; (5) constructive amendment of the immigration fraud conspiracy count; (6) improper expert testimony from lay witness Jan Lyons; (7) improper hearsay evidence; (8) improper summary witness testimony from Yvonne Evans; and improper jury instructions (9) for failure to issue an estoppel instruction, (10) incorrect use of an "ignorance of the law" instruction, (11) incorrect use of a "deliberate ignorance" instruction, and (12) failure to cure jury confusion.

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit J

2025 WL 1866022
Only the Westlaw citation is currently available.
United States District Court, E.D. Louisiana.

UNITED STATES of America
v.
Scharmaine Lawson BAKER

CRIMINAL ACTION NO. 24-99
|
Signed July 7, 2025

**Attorneys and Law Firms**

Nicholas Dupuy Moses, Assistant U.S. Attorney, DOJ-United States Attorney's Office, New Orleans, LA, Gary Crosby II, Assistant U.S. Attorney, DOJ-Crm, Criminal Division, Fraud Section, Washington, DC, Kelly Zack Walters, Samantha Usher, Assistant U.S. Attorneys, DOJ-Crm, Health Care Fraud Section, Washington, DC, for United States of America.

Clarence Roby, Jr., Law Office of Clarence Roby, Jr. APLC, Gretna, LA, for Scharmaine Lawson Baker.

SECTION "R" (1)

**ORDER AND REASONS**

SARAH S. VANCE, UNITED STATES DISTRICT JUDGE

***1** Before the Court is the Government's omnibus motion *in limine*.[1] Defendant opposed part of the omnibus motion.[2] For the following reasons, the Court grants the motion in part and defers it in part.

## I. BACKGROUND

On April 25, 2024, the Government filed an indictment charging Scharmaine Lawson Baker with six counts of health care fraud.[3] Baker pled not guilty to the charges in the indictment,[4] and her trial is scheduled for July 21, 2025.[5]

The Government now moves to (1) exclude evidence and argument related to specific instances of "good deeds" and "law-abidingness;" (2) preclude defendant from eliciting testimony about her own hearsay statements to witnesses or other third parties; (3) preclude defendant from using interview reports prepared by law enforcement agents to impeach government witnesses; (4) exclude evidence and argument suggesting selective prosecution; (5) preclude defendant from arguing about the government's failure to call a particular witness; (6) exclude any mention of plea negotiations, offers, or the defendant's rejection of a plea offer; (7) exclude evidence and argument blaming Medicare as the victim of the charged offenses; (8) exclude evidence and argument related to harm or prejudice to the defendant caused by the indictment; and (9) exclude evidence and argument that the defendant should be acquitted for reasons other than the evidence and the law.[6] Defendant opposes the exclusion of the first, second, and third categories of evidence and arguments.[7]

## II. DISCUSSION

### A. Opposed motions in limine.

*1. Evidence and argument related to specific instances of "good deeds" and "law abidingness."*

The government argues that evidence and argument related to specific instances of "good deeds" and "law-abidingness," including evidence of defendant's legitimate billing or legitimate services, as circumstantial proof that she is not guilty, should be excluded.[8] Specifically, the government states that defendant may try to introduce evidence about instances in which she followed the applicable rules, helped patients, or legitimately performed or billed for services, or that the cancer genetic testing she is accused of prescribing improperly provided some benefits to patients.[9] The government argues that this evidence is inadmissible as it is irrelevant to the charges and is improper character evidence because defendant's character is not an element of the charge.[10] Defendant argues that honesty is a pertinent character trait to 18 U.S.C. § 1347, and defendant should not be precluded from introducing any character evidence.[11]

Federal Rules of Evidence 404 and 405 govern a defendant's ability to introduce character evidence. Rule 404 states: "Evidence of a person's character is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." Fed. R. Evid. 404(a)(1). The Rule provides an exception for criminal cases, under which a defendant may "offer evidence of the defendant's pertinent


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

trait." Fed. R. Evid. 404(a)(2)(A). "In the criminal context, a pertinent trait is one that is relevant to the offense charged." *United States v. John*, 309 F.3d 298, 303 (5th Cir. 2002) (citing *United States v. Hewitt*, 634 F.2d 277, 279 (5th Cir. 1981)).

***2** Rule 405 establishes the methods by which a defendant may prove character. Fed. R. Evid. 404(b). Under Rule 405(b), specific instances of conduct are not permitted, unless the pertinent character trait is an essential element of a charge, claim, or defense. *Id*. In *United States v. Gulley*, the Fifth Circuit found that Rule 405(b) "limits the use of specific prior acts to cases where character is at issue in the *strict sense*." 526 F.3d 809, 818 (5th Cir. 2008) (emphasis added).

Defendant has been charged with six counts of health care fraud. Defendant's character is "not an essential element of the charges against [her]." *United States v. Kahn*, 768 F. App'x 266, 270 (5th Cir. 2019) (affirming the exclusion of evidence of good character in a health care fraud case when the defendant was charged under, among other statutes, 18 U.S.C. § 1347); *see also United States v. Marrero*, 904 F.2d 251, 260 (5th Cir. 1990) (affirming the exclusion of evidence of proper billings in an insurance fraud case because the evidence was irrelevant to the charges in the indictment). Accordingly, the Court grants the government's motion to exclude evidence and argument related to specific instances of "good deeds" and "law abidingness."

*2. Testimony about defendant's own hearsay statements to witnesses or other third parties.*

The government seeks to preclude defendant from attempting to elicit or admit her own self-serving statements made to law enforcement agents, government investigators, or other witnesses as inadmissible hearsay.[12] Defendant argues that granting the government's motion would deny defendant the right to respond to inaccuracies, embellishments, and mischaracterizations introduced by the government through the defendant's inculpatory statements.[13]

Federal Rule of Evidence 802 provides that hearsay is inadmissible unless a federal statute, the federal rules of evidence, or other rules prescribed by the Supreme Court provide otherwise. "The rules do not...provide exceptions for self-serving, exculpatory statements made by a party which are being sought for admission by that same party." *United States v. Wilkerson*, 84 F.3d 692, 696 (4th Cir. 1996); *see also United States v. Quanash,* 171 F. App'x 51, 52 (9th Cir. 2006) ("Self-serving statements are not exempted from the hearsay rule by...exemption or exception and are thus inadmissible hearsay."); *United States v. Crinel*, 2016 WL 6441249 (E.D. La. Nov. 1, 2016) (granting motion *in limine* to exclude such testimony in a health care fraud trial) (Morgan, J.).

The Fifth Circuit has recognized "that statements that are otherwise barred by the hearsay rules remain admissible under Rule 106." *United States v. Carpenter*, 2025 WL 120670, at *4 (5th Cir. 2025) (quoting *United States v. Portillo*, 969 F.3d 144, 176 (5th Cir. 2020)). Amended Federal Rule of Evidence 106 states:

> If a party introduces all or part of a statement, an adverse party may require the introduction, at that time, of any other part – or any other statement – that in fairness ought to be considered at the same time. The adverse party may do so over a hearsay objection.

The Committee Notes to the most recent amendment of Rule 106 clearly state that the amended rule "does not give a green light of admissibility to all excised portions of statements. It does not change the basic rule, which applies only to the narrow circumstances in which a party has created a misimpression about the statement, and the adverse party proffers a statement that in fact corrects the misimpression." Fed. R. Evid. 106 cmt.

***3** The Fifth Circuit has held that "Rule 106 requires the introduction of ...[additional material] only when the omitted portion is necessary to qualify, explain, or place into context the portion already introduced." *United States v. Herman*, 997 F.3d 251, 264 (5th Cir. 2021) (quoting *United States v. Branch*, 91 F.3d 699, 728 (5th Cir. 1996)); *United States v. Crosby*, 713 F.2d 1066, 1074 (5th Cir. 1983) (Rule 106 "restricts a requirement of completeness by the qualification that the portion sought to be admitted must be relevant to the issues, and only the parts which qualify or explain the subject matter of the portion offered by the opponent need to be admitted.") (citing *United States v. McCorkle*, 511 F.2d 482, 486 (7th Cir. 1975), *cert. denied*, 423 U.S. 826 (1975)); *see also United States v. Cleveland*, 1997 WL 253120, at *1 (E.D. La. May 14, 1997) ("Rule 106's fairness standard...require[s] that the omitted portion be relevant and necessary to qualify, explain, or place into context the portion already introduced.") (Vance, J.). Further, the Rule "does not permit a party to introduce ... [additional material] to affirmatively advance their own, alternative theory of the case." *Herman*, 997 F.3d at 264. (quoting *Branch*, 91 F.3d at 731).

The Committee Notes also state that the amended rule "cover[s] all statements, including oral statements, that have not been recorded." Fed. R. Evid. 106 cmt. However, "[a] party seeking completion with an unrecorded statement would...need to provide admissible evidence that the statement was made."[14] *Id.*

To use Rule 106, defendant must point to the specific statements she wants admitted "so that the district court can assess their admissibility on fairness grounds." *United States v. Macrina*, 109 F.4th 1341, 1348 (11th Cir. 2024); *see also* *Branch*, 91 F.3d at 729-31. The defendant must explain with particularity why each statement satisfies Rule 106's requirement that the statement "is necessary to qualify, explain, or place into context the portion already introduced." *Herman*, 997 F.3d at 264.

Without viewing the statements that defendant seeks to admit, the Court cannot rule on a blanket request to prohibit the introduction of defendant's own statements. The Court orders defendant to identify by July 14, 2025, any statements by defendant in recordings already produced to defendant as government exhibits, that defendant seeks to introduce under Rule 106. Defendant must identify the specific statements (e.g., by providing the exact lines of a transcript) and explain why any such evidence satisfies Rule 106. The government's response is due by July 17, 2025. If, during trial, defendant seeks to admit a statement under Rule 106, defendant must approach the bench and identify the specific statement defendant seeks to introduce and explain with particularity why each statement satisfies Rule 106 as outlined above. Accordingly, the Court defers ruling on the government's motion to exclude testimony about defendant's own hearsay statements to witnesses or other third parties.

*3. Use of interview reports prepared by law enforcement agents to impeach government witnesses.*

The government seeks to preclude defendant from introducing an interview report to impeach a witness as a prior inconsistent statement of anyone other than the report's author.[15] Additionally, the government requests that the defendant be precluded from reciting or publishing the contents of the interview reports to the jury in those circumstances or otherwise suggesting the reports are statements of the witness.[16] Defendant argues that whether the interview reports are a substantially verbatim recital under the Jencks Act is a factual question for the Court to resolve based on any conflicting witness testimony.[17] Thus, defendant argues, she should not be precluded from using the interview reports to determine whether they are substantially verbatim.[18] Defendant additionally argues that the government's motion should be denied because it is unclear which reports will be introduced at trial.[19]

***4** A "witness may not be impeached with a third party's characterization or interpretation of a prior oral statement unless the witness has subscribed to or otherwise adopted the statement as his own." *United States v. Saget*, 991 F.2d 702, 710 (11th Cir. 1993). Thus, the Court cannot issue a blanket ruling without first deciding whether the statements are verbatim, or the witnesses have "subscribed to or otherwise adopted the statement[s] as [their] own." *Id.* "If it can be established that a [g]overnment witness did adopt a statement or it was recorded verbatim, the interview report may be used for impeachment during the cross-examination of the witness who made the statement. If not, the report itself may be offered only through the agent to prove that the statement was made to the agent, rather than to prove the truth of the matter asserted in the statement." *United States v. Akula*, 2023 WL 4235568, at *5 (E.D. La. Jun. 28, 2023) (quoting *Crinel*, 2016 WL 6441249, at *4) (Africk, J.).

If defendant seeks to use any interview reports for impeachment purposes, defendant must first make a showing that the statement has been adopted by the witness or that the statement was recorded verbatim. Otherwise, defendant may ask only if the statement was made. Upon request, the Court will issue a limiting instruction.

The defendant has already received Jencks material from the government. The Court orders defendant to identify any interview reports produced by the government that she contends have been signed, adopted, or were recorded verbatim by July 8, 2025. The government's response is due July 15, 2025. Accordingly, the Court defers ruling on the government's motion to preclude defendant from using interview reports prepared by law enforcement agents to impeach government witnesses.

**B. Unopposed motions in limine.**

*1. Evidence and argument suggesting selective prosecution.*

Arguments regarding selective prosecution must be raised with the Court before trial and should not be presented to the jury. Fed. R. Crim. Pro. 12(b)(3)(A). Further, the Supreme Court has held that a "selective-prosecution claim is not a


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

defense on the merits to the criminal charge itself." *United States v. Armstrong*, 517 U.S. 456, 463 (1996). Thus, evidence of selective prosecution may not be presented to the jury at trial. Accordingly, the Court grants the government's motion to exclude evidence and argument suggesting selective prosecution.

*2. The government's failure to call a particular witness.*

Whether a negative inference can be drawn from the failure to call a particular witness depends on whether that witness is "equally available" to both parties. *McClanahan v. United States*, 230 F.2d 919, 925 (5th Cir. 1956). "If the witness is equally available to both parties, any negative inference from one party's failure to call that witness is impermissible." *United States v. Wilson*, 322 F.3d 353, 363 n.14 (5th Cir. 2003) (citing *McClanahan*, 230 F.2d at 925). When the witness is not equally available, "a party's failure to call available witnesses or produce evidence that would clarify or explain disputed factual issues can give rise to a presumption that the evidence, if produced, would be unfavorable to that party." *Id*. Even so, the negative inference may be drawn only if "the missing witness has information peculiarly within his knowledge." *Id*. (citing *Streber v. Comm'r of Internal Revenue*, 138 F.3d 216, 221-22 (5th Cir. 1998)). The government asserts that the defendant can subpoena any witness available to the government.[20] Defendant does not contest this point. Accordingly, the Court grants the government's motion to preclude defendant from commenting on the government's failure to call a particular witness.

*3. Mention of plea negotiations, offers, or the defendant's rejection of a plea offer.*

***5** Plea negotiations and related statements are irrelevant to Baker's guilt or innocence. *See United States v. Martin*, 431 F.3d 846, 852 (5th Cir. 2005) ("Discussions during plea negotiations are clearly not admissible."). Accordingly, the Court grants the government's motion to preclude the mention of plea negotiations, offers, or the defendant's rejection of a plea offer.

*4. Evidence and argument blaming Medicare as the victim of the charged offenses.*

The Fifth Circuit has held that negligence on the part of the victim is not a shield for the defendant. *United States v. Kreimer*, 609 F.2d 126, 132 (5th Cir. 1980). In *Kreimer*, the Fifth Circuit stated:

> The victim's negligence is not a defense to criminal conduct. The truth about virtually every scheme to defraud could be obtained if the gull were clever and diligent enough....The laws protecting against fraud are most needed to protect the careless and the naïve from lupine predators, and they are designed for that purpose.

*Id.* Accordingly, the Court grants the government's motion to preclude defendant from introducing evidence and argument blaming Medicare.

*5. Evidence and Argument related to harm or prejudice to the defendant caused by the indictment.*

Evidence related to any harm or prejudice that being under Indictment has caused defendant does not negate any element of the charged offenses, and does not constitute a defense against those charges. Such evidence has no "tendency to make a fact [of consequence] more or less probable than it would be without the evidence." Fed. R. Evid. 401. Thus, such evidence is not relevant. Accordingly, the Court grants the government's motion to exclude evidence and argument related to harm or prejudice the defendant may be experiencing.

*6. Evidence and argument that the defendant should be acquitted for reasons other than the evidence and the law.*

"Jury nullification is not a right belonging to the defendant," and "[a] trial judge may block defense attorneys' attempts to serenade a jury with the siren song of nullification." *United States v. Thompson*, 253 F.3d 700, 2001 WL 498430 at *16 (first citing *United States v. Gonzalez*, 110 F.3d 936, 947-48 (2d Cir. 1997); and then citing *United States v. Sepulveda*, 15 F.3d 1161, 1190 (1st Cir. 1993)). In *Thompson*, the Fifth Circuit endorsed the principle that jury nullification is not desirable and that trial judges should exercise their power to prevent it when possible. *Id.* (citing *United States v. Thomas*, 116 F.3d 606, 614 (2d Cir. 1997) ("We categorically reject the idea that, in a society, committed to the rule of law, jury nullification is desirable or that courts may permit it to occur when it is within their authority to prevent.")). Accordingly, the Court grants the government's motion to preclude defendant from introducing evidence and argument that she should be acquitted for reasons other than the evidence and the law.

## III. CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART AND DEFERS IN PART the Government's motion *in limine*.

**All Citations**

Slip Copy, 2025 WL 1866022

Footnotes

1 R. Doc. 40.

2 R. Doc. 43.

3 R. Doc. 1.

4 R. Doc. 15.

5 R. Doc. 34.

6 R. Doc. 40-1.

7 R. Doc. 43.

8 R. Doc. 40-1 at 3.

9 *Id*. at 5.

10 R. Doc. 40-1 at 3-5.

11 R. Doc. 43 at 2-4.

12 R. Doc. 40-1 at 6.

13 R. Doc. 43 at 4-6.

14 The Committee Notes continue: “Otherwise, there would be no showing that the original statement is misleading, and the request for completion should be denied. In some cases, the court may find that the difficulty in proving the completing statement substantially outweighs its probative value– in which case exclusion is possible under Rule 403.” *Id*.

15 R. Doc. 40-1 at 8.

16 *Id.*

17 R. Doc. 43 at 6-7.

18 *Id.* at 7.

19 *Id.*

20 R. Doc. 40-1 at 11.

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.